Exhibit Q

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION


BERNARD D. WILSON,
DC# T24935,

        Plaintiff,

-vs-                        CASE NO. 5:23-CV-253-TKW/MJF


INGRAM, ET AL.,

        Defendants.
_____/


DEPOSITION OF BERNARD D. WILSON


DATE TAKEN:      SEPTEMBER 24, 2024

TIME:            10:00 A.M. - 12:08 P.M.

PLACE TAKEN:     BY ZOOM VIDEOCONFERENCE


BEHALF OF:       Defendants


STENOGRAPHIC REPORTER:
Andrea J. Stefanick, RPR, RMR, CRR, CRC, FPR-C
Notary Public, State of Florida at Large

---

MIKULICE REPORTING SERVICES
2069 First Street, Suite 201
Fort Myers, Florida  33901
(239) 334-6545
Fax (239) 332-2913

1                    A P P E A R A N C E S

2    (All parties appearing remotely)

3    ON BEHALF OF THE PLAINTIFF:

4    JAMES V. COOK, ESQUIRE
     LAW OFFICE OF JAMES COOK
5    314 West Jefferson Street
     Tallahassee, FL  32301
6    (850) 222-8080
     cookjv@gmail.com
7
     JOSHUA TARJAN, ESQUIRE
8    THE TARJAN LAW FIRM, P.A.
     12372 SW 82nd Avenue
9    Pinecrest, FL 33156-5223
     (305) 423-8747
10   josh@tarjanlawfirm.com

11

12   ON BEHALF OF THE DEFENDANTS:

13   ERIK KVERNE, ASSISTANT ATTORNEY GENERAL
     MASON PETROSKY, ASSISTANT ATTORNEY GENERAL
14   OFFICE OF THE ATTORNEY GENERAL
     The Capitol, Suite PL-01
15   Tallahassee, FL 32399
     (850) 414-3300
16   erik.kverne@myfloridalegal.com
     mason.petrosky@myfloridalegal.com
17

18   ALSO PRESENT:

19   Correctional Officer J. Woodruff

20
                          -    -    -
21

22

23

24

25

1                          I N D E X

2

  WITNESS:    BERNARD D. WILSON                    Page

3

4   DIRECT EXAMINATION                                5
    BY MR. KVERNE

5
    CROSS-EXAMINATION                               99

6   BY MR. COOK

7   REDIRECT EXAMINATION                           108
    BY MR. KVERNE

8
    RECROSS-EXAMINATION                            116

9   BY MR. COOK

10
                        READ LETTER               118

11
                        ERRATA SHEET              119

12
                        CERTIFICATE OF OATH       120

13
                        CERTIFICATE OF REPORTER   121

14

15
    (No exhibits were marked.)

16

17

18

19

20

21

22

23

24

25

1    Thereupon, the following proceedings were had:

2

3                    (Witness ID:  Prison Face Sheet,

4            I.D. No. T-24935.)

5                MR. COOK:  I'm sure you would stipulate.

6                MR. KVERNE:  I believe Mr. Cook and

7            Mr. Tarjan, and they know their client.

8                MR. COOK:  Oh, yeah.

9                (Discussion was held off the record.)

10                MR. COOK:  My question was simply

11            whether there was an officer present who was

12            going to be present during the deposition.

13                MR. WILSON:  There's an officer present.

14            He doesn't know whether he's going to be present

15            or not.

16                THE COURT REPORTER:  Could I get his name,

17            please?

18                CORRECTIONAL OFFICER WOODRUFF:  C.O. J.

19            Woodruff, W-O-O-D-R-U-F-F.

20                MR. COOK:  The parties would stipulate to

21            his identification.

22                MR. KVERNE:  That's fine, we can

23            stipulate.  I believe Mr. Cook and Mr. Tarjan

24            know that's their client, so...

25                MR. COOK:  Whenever they come back with

```
 1              the face sheet, they can put it up on the screen
 2              I'm sure.
 3                   (Discussion was held off the record.)
 4                   THE COURT REPORTER:  Would you raise your
 5              right hand, please?
 6                   Do you solemnly swear or affirm that the
 7              testimony you're about to give in this cause is
 8              the truth, the whole truth and nothing but the
 9              truth?
10                   THE WITNESS:  Yes, ma'am.
11                        DIRECT EXAMINATION
12  BY MR. KVERNE:
13     Q.    Good morning, Mr. Wilson.  My name is Erik
14  Kverne and I represent the Office of the Attorney
15  General.  I represent a couple of defendants;
16  Mrs. Danielle Jones, Mr. Joshua Causey, Mr. Jonathan
17  Grainger and Mr. Benny Ingram.
18         Are those individuals that you have sued in
19  this case?
20     A.    Yes, sir.
21     Q.    Okay.  And the case number is -- well, the
22  case style is Wilson versus Ingram and others,
23  5:23-CV-253-TKW/MJF in the Northern District of
24  Florida, Panama City Division; is that correct?
25     A.    Yes, sir.
```

1      Q.    Okay.  Could you just state your full name

2   for the record, please?

3      A.    Bernard Wilson.

4      Q.    Okay.  And your D.C. number is what, for the

5   record?

6      A.    T-24935.

7      Q.    Okay.  And we are here today doing a

8   deposition over Zoom; is that correct?

9      A.    Yes, sir.

10     Q.    Okay.  I'm here on Tuesday, September 24th

11  to ask you some questions about this case.  Would you

12  be able to answer those questions for me?

13     A.    To the best of my ability, sir.

14     Q.    Okay.  So have you ever been deposed before?

15     A.    Yes, sir.

16     Q.    Okay.  So I'm just going to go over the

17  ground rules already.

18          Madam Court Reporter has already stated,

19  basically, the first one and probably the most

20  important one for her, which is, basically, we'll do

21  our best not to talk over each other; same thing with

22  your attorneys when they're questioning as well.

23          She's creating a transcript of the

24  conversation.  So it's basically just going to read

25  inaudible or talkers or something like that and we

1  won't have any idea what was being said during that

2  point.

3       Okay?

4  A.   Yes, sir.

5  Q.   So I'll do my best to do that and I'm just

6  going to ask you to do your best as well.

7       You're doing a good job of it so far.  Try

8  to answer the questions verbally for me.  If you just

9  nod your head, generally the transcript is just going

10  to say "nods head," nothing really specific.  So just

11  do your best to answer the questions verbally for me.

12  Okay?

13  A.   Yes, sir.

14  Q.   If you do not understand a question, please

15  ask me to rephrase the question.  I'll be happy to do

16  so.

17       Just same thing, if you don't know the

18  answer to a question, it's okay to say "I don't

19  know."  All right?

20  A.   Yes, sir.

21  Q.   Same thing with if you don't remember the

22  answer of a question, it's okay to say "I don't

23  remember."  All right?

24  A.   Yes, sir.

25  Q.   If you need to take a break, please let me

```
 1   know.  We'll be happy to take a break.
 2           I expect this will probably be an hour, hour
 3   and a half at the most.  This is not going to really
 4   even be that -- that long.  But if you need to take a
 5   break at some point, just let me know.
 6           Okay?
 7      A.   Yes, sir.
 8      Q.   All right.  Same thing with Mr. Cook and
 9   Mr. Tarjan and also same with you, Madam Court
10   Reporter.
11           Now, this is going to sound like a silly
12   question.  Are you under the influence of drugs or
13   alcohol today?
14      A.   Not at the moment, sir.
15      Q.   Okay.  Do you take any medications?
16      A.   Yes, sir.
17      Q.   Okay.  Would those medications impact your
18   ability to be truthful here today?
19      A.   No, sir.
20      Q.   Is there any reason why you would not be
21   able to be truthful here today?
22      A.   No, sir.
23      Q.   Okay.  After the transcripts are complete --
24   I'm going to direct this question to Mr. Cook.
25                   MR. KVERNE:  Do you want your client to be
```

```
 1              able to read the transcripts?
 2                   MR. COOK:  Yes, we'll ask to read.
 3  BY MR. KVERNE:
 4      Q.   Okay.  So, Mr. Wilson, Mr. Cook will arrange
 5  that for you, to be able to read the transcripts.
 6  You'll be able to review them and make sure that
 7  they're accurate.
 8              Obviously, if there are any issues; for
 9  example, the main type of issue would be like maybe
10  the court reporter transcribed a "he" and you meant a
11  "she."  You could possibly change that type of thing,
12  but you can't change the entire substance of answers.
13              Okay?
14      A.   Yes, sir.
15      Q.   If you were to try to change the entire
16  substance of an answer, I can come back and ask you
17  questions about it.
18              All right?
19      A.   Yes, sir.
20      Q.   Now, the issues in this case involves --
21  basically involves a situation that occurred on
22  November 8, 2022; is that correct?
23      A.   Yes, sir.
24      Q.   Okay.  But before we get there, I have
25  some -- just questions about some other stuff
```

1    beforehand.

2            Now, any of the defendants that I reference,

3    Ms. Danielle Jones, Mr. Causey, Mr. Grainger and

4    Mr. Ingram --

5            (Stenographer requested clarification.)

6    BY MR. KVERNE:

7        Q.    Okay.  So, Ms. Danielle Jones, Mr. Joshua

8    Causey, Mr. Jonathan Grainger, Mr. Benny Ingram,

9    prior to November 8th, 2022, so prior to, did you

10   have any interactions with any of them?

11       A.    As far as their duty-wise?  I mean, as far

12   as telling me to get in line or something like that?

13   I mean, I'm not understanding.

14       Q.    So --

15       A.    What do you mean?

16       Q.    I'm just mainly concerned with like

17   significant interactions.

18            Have they ever written you a disciplinary

19   report before?  Did you have any problems with them

20   that you can remember?  Any of them.

21       A.    Not that I can recollect.

22       Q.    Okay.  And that's fair.  I'm just trying to

23   get a little bit of background.

24            Okay.  So what about after the November 8th,

25   2022, incident, did you have any interactions with

```
 1   any of those individuals after November 8, 2022?
 2       A.   Yes, I did.
 3       Q.   Okay.  Okay.  So, with who?
 4       A.   All three -- all four.
 5       Q.   All four of them, okay.
 6            What are the interactions that you remember?
 7       A.   After November 8th --
 8       Q.   Yes.
 9       A.   -- I was basically confronted by Danielle
10   Jones.
11       Q.   Okay.
12       A.   She came to my dormitory and placed me in
13   confinement.
14       Q.   Okay.
15       A.   That was prior -- that was after
16   November 8th.
17       Q.   All right.  And that placement in
18   confinement, when did that occur?  Do you remember?
19       A.   If I'm not mistaken, it was -- I want to say
20   November 13, 2022.
21       Q.   So about five days after the November 8th
22   incident?
23       A.   Yes.
24       Q.   Okay.
25       A.   Yes.
```

1    Q.    And why were you placed in confinement?

2    A.    She told me it was -- Danielle Jones,

3  she -- she iterated to me that the reason why I was

4  placed in confinement was for my filing grievances

5  and pursuing a sick call pertaining to the issue that

6  occurred on November 8th while in confinement.

7    Q.    Okay.  So "pursuing a sick call," meaning

8  you submitted an inmate request to see medical?

9    A.    Yes.

10    Q.    Okay.  What day did you submit that inmate

11  request?  Do you remember?

12    A.    I don't want to -- I want to say the 9th.

13  It was the day after -- it was the day after the

14  incident I was released from confinement.

15    Q.    Okay.  So you don't remember exactly, but

16  you believe it was the 9th?

17    A.    It was as soon as I was released from

18  confinement.  If I was released from confinement on

19  the 9th, if I was coming through center gate, I

20  placed the sick call and the grievances in the box at

21  the same moment.

22    Q.    Okay.  And as a result of that, did you ever

23  see medical based on that sick call?

24    A.    Yes.

25    Q.    Okay.

```
 1      A.    Yes.

 2      Q.    You did?

 3      A.    Yes.

 4      Q.    Okay.  When you -- when did you see medical

 5  based on the sick call?

 6      A.    I can't recollect the exact date or how many

 7  days it was after filing the sick call, but it was no

 8  longer than a week.

 9      Q.    Okay.  Was it before or after the

10  interaction that you had with Ms. Jones?

11      A.    I can't recall.

12      Q.    Okay.

13      A.    I -- I can't recall.

14      Q.    All right.  And that's fair.  It's been a

15  couple years, so I totally understand.  I totally

16  understand.  So, all right.

17            Now, you said that she placed you in

18  confinement and it was based on the sick call and

19  grievances, correct?

20      A.    Correct.

21      Q.    Okay.  Was she alone when she placed you in

22  confinement?  Was she with other officers?  Do you

23  remember?

24      A.    She originally -- originally, she entered

25  the dorm alone.
```

1              Placing me in confinement, she was -- I

2    don't know the officer's name.  I want to say it was

3    a T-A-S or something along those lines, but someone

4    walked with her, I just can't remember who it was.

5         Q.    Okay.  And then she escorted you.

6              What -- what dorm were you in initially,

7    before being placed in confinement?  Do you remember?

8         A.    The dorm that I was in when she came to

9    place me in confinement?

10        Q.    Yes.

11        A.    It was Gulf.  It was Gulf dorm.

12        Q.    G dorm?

13        A.    Yes, sir.

14        Q.    And then she placed you in confinement.

15   What dorm was that in?

16        A.    Confinement is H dorm.

17        Q.    Okay.  So she took you from G to H?

18        A.    She took me from G to medical for the

19   pre-confinement physical.

20        Q.    Okay.

21        A.    And from there, you go on to confinement.

22        Q.    Okay.  And you said that this occurred, from

23   your recollection, on the 13th; is that correct?

24        A.    Yes, sir.

25        Q.    Okay.

1    A.    Yes, sir.

2    Q.    All right.  And then you were placed in

3 confinement.  How long were you in confinement for?

4    A.    Approximately a week.

5    Q.    Okay.  And when you left confinement, where

6 were you placed after that?

7    A.    Back in -- back in Gulf dorm.

8    Q.    Back in G dorm again?

9    A.    Yes, sir.

10    Q.    Okay.  Any other interactions with Ms. Jones

11 that you can remember?

12    A.    Throughout.  Throughout my stay, yes.

13    Q.    Okay.

14    A.    I mean, but I'm not going to remember

15 precise dates due to, it was a number of incidents.

16    Q.    Okay.  Anything else -- any other

17 significant incident that you can remember with

18 Ms. Danielle Jones?

19    A.    I mean, to me, to me, they were all

20 significant.  But it was just threats here and there.

21 She made a threat, she threatened to lock me up,

22 things of that nature.

23          But, I mean, I'm not going to remember,

24 like I'm not going to remember precise dates.

25    Q.    Okay.  What kind of things would she say to

1   you, if you said she was threatening you?

2       A.   She could be working at center gate or she

3   could be working security nine and she would inform

4   the dorm that -- the guys that they were walking

5   with, that I was a snitch for writing grievances,

6   things of that nature.

7       Q.   Okay.  Do you remember any specific officer

8   she ever said that to?

9       A.   It was inmates.

10      Q.   Oh, general inmates --

11      A.   Yes.

12      Q.   -- that she would say that to.

13      A.   Yes.

14      Q.   Any specific inmates that she had said that

15  to?

16      A.   I wouldn't know the name right off.  None of

17  us really -- like, I never really hung with a lot of

18  inmates like that.

19      Q.   What about nicknames?

20      A.   Nicknames?  D.J.  J White, and Black.  But I

21  don't know their real names.

22      Q.   And Black was the other guy?

23      A.   Yes.

24      Q.   Like the color, right?

25      A.   Yes.

```
 1      Q.    Okay.  Can you give me any descriptions of
 2  those three?
 3            What do they look like?
 4      A.    Black is probably about 5'8", hundred
 5  and -- I don't know weight, so I'm not going to be
 6  able to say weight.  Slender build, receding
 7  hairline, low haircut.
 8      Q.    Okay.  What about J White?
 9      A.    J White, white guy, big.  He's approximately
10  the same size.  Few tattoos in his face.
11      Q.    Okay.  And then you've said T.J.
12      A.    Right.  D.J.  D. D.
13      Q.    Yeah, D, like dog, right?
14      A.    Right.
15      Q.    So D.J., what did he look like?
16      A.    Heavy set, wide, sort of chubby.
17      Q.    Okay.
18      A.    Probably about 6'2", 6 -- between 5'11" and
19  6'2".
20      Q.    Okay.  So he's taller than the other guys.
21      A.    Right.
22      Q.    Okay.  All right.  So that's Ms. Jones.
23            What about the -- what about Mr. Causey?
24  Any interactions after November 8th, 2022, that you
25  can remember?
```

1    A.    Yeah.  Yeah.  I just can't remember the
2  precise date.
3          But me and Causey had a issue where he got
4  upset with me and slammed me into the door of my
5  cell.  He slammed, like, literally by my arms.
6  Because the door wouldn't open wide enough and he
7  tried to make me go through the door but the door was
8  jammed and there was only like a six-inch crack and
9  he wanted me to squeeze through the crack.
10          I explained to him, Could you please open
11  the door a little wider?
12          He started calling me derogatory names and
13  tried to shove me through the door.  But instead of
14  going through the door, I actually hit the door
15  because it wasn't wide enough for me to fit through.
16    Q.    Okay.  And that was, you said, after
17  November 8th.
18    A.    Yes.
19    Q.    About how long after November 8th would that
20  be?
21          I know that you --
22    A.    This is probably about -- this had to be
23  around February -- around March.
24    Q.    The following year?
25    A.    March or April of '23.

1    Q.    Okay.  And it was a use of force situation?
2    What was it?
3    A.    It -- it -- did it get [sic] the camera?
4          It was.  It was.  And I want to say I
5    was -- I was made to write a witness statement,
6    saying that I didn't want to press the issue no
7    further.
8    Q.    Okay.  So your recollection is that there
9    was a statement that was written by you sometime in
10   March --
11   A.    March.
12   Q.    -- or April.
13   A.    March, April-ish, yes.
14   Q.    Okay.  All right.
15         Anything else that you can remember from
16   Mr. Causey?
17   A.    No.
18   Q.    Okay.
19         What about Mr. Grainger?
20   A.    Grainger, yes.
21   Q.    Okay.  So what do you remember about
22   incidents after November 8th, 2022, involving
23   Grainger?
24   A.    Grainger, Grainger once pronounced in the
25   dormitory, he came into G dormitory once and had a

1    security check when he wasn't stationed in G

2    dormitory and he informed the whole entire dorm that

3    I was a rat.

4         Q.   Okay.  When did -- when did that occur?

5                  (Stenographer requested clarification.)

6                  THE WITNESS:  The dorm, the dormitory that

7         I was a rat, which means I was a snitch.

8    BY MR. KVERNE:

9         Q.   Okay.

10        A.   And then --

11        Q.   When did that occur?

12        A.   That occurred around May-ish.  Sometime in

13   May.  And I got --

14        Q.   2023 again?

15        A.   Excuse me?

16        Q.   May 2023 again?

17        A.   Correct.

18        Q.   Did anything come out of that incident?

19             Did you get a DR or anything surrounding

20   that?

21        A.   I didn't get any DRs or anything.  I was

22   stabbed right after it.  I was --

23        Q.   Okay.  So you were attacked after that date.

24        A.   For an inmate and a snitch, yes.

25        Q.   Okay.  And who were you attacked by after

```
 1   that date?
 2       A.   Some other gang.
 3               (Stenographer requested clarification.)
 4   BY MS. KVERNE:
 5       Q.   Some other gang member, you said?
 6       A.   Somebody said something?
 7       Q.   No.
 8       A.   Oh.  Yes.
 9       Q.   Go ahead.  So you said some other gang
10   member?
11       A.   Yes.
12       Q.   Okay.  Do you remember who that gang member
13   was?
14       A.   Yes.
15       Q.   Who?
16       A.   His name was Brett Pelham.
17       Q.   All right.  What member -- what gang was he
18   a member of?
19       A.   He was a member of the G's.
20       Q.   G's?
21       A.   Yes.
22       Q.   What -- is the G's short for anything?
23       A.   Gangster Disciples.
24               (Stenographer requested clarification.)
25               THE WITNESS:  Gangster Disciples.
```

1    BY MR. KVERNE:

2        Q.    Okay.  Any other incident that you can

3    remember with Mr. Grainger?

4        A.    Me and Grainger had a run -- yeah, yeah.

5    Yeah, Grainger got -- Grainger -- I was gassed

6    because of Grainger.

7        Q.    When?

8        A.    Not remembering exact date, I received a

9    disciplinary report, there was a use of force made.

10            Yeah, I was gassed.  Grainger got me gassed.

11       Q.    Was this in the same incident as the one

12   that you talked about with Mr. Causey --

13       A.    No.

14       Q.    -- or was this a different incident?

15       A.    This is a different incident.  This is a

16   different incident.  There was a use of force

17   conducted involving Grainger.

18            (Stenographer requested clarification.)

19            THE WITNESS:  Gassed, yeah, G-A-S-S-E-D.

20   BY MR. KVERNE:

21       Q.    About how long after November did that

22   occur?  Do you remember?

23       A.    Within a year.

24       Q.    Within a year.  So --

25       A.    Yes.

1    Q.    -- before November 2023, but during 2023.

2    A.    Correct.

3    Q.    Okay.  All right.

4          Any other things you can remember with

5    Mr. Grainger?

6    A.    With Grainger, there was a number of things

7    with Grainger.  I'm not going to be precise and

8    remember every incident.  But Grainger was very

9    active.  Inmate Ingram was very active in

10   antagonizing.

11   Q.    Okay.  And then Mr. Ingram, what do you

12   remember about Mr. Ingram?

13   A.    Same thing.  He was very antagonistic

14   throughout -- since November twenty -- so since the

15   November incident until I was just transferred,

16   Ingram was very antagonistic.

17   Q.    Okay.  When were you transferred?

18   A.    June 27th, 2024.

19   Q.    So you remained at -- you remained at

20   Jackson, right?

21         From when to when?

22   A.    From -- my entire stay?

23   Q.    Yes.

24   A.    August '22 'til June 27, 2024.

25   Q.    Okay.  And during that stay, were you ever

1    in the administrative management unit or anything?

2        A.    Yes.   That's where I was at the whole entire

3    time.

4        Q.    Okay.   So you were in the, what we'll refer

5    to it as the AMU --

6        A.    Yes.

7        Q.    -- the entire time?

8        A.    Yes, the administrative management unit --

9        Q.    Okay.

10       A.    -- the entire time.

11       Q.    What interactions did you have with

12   Mr. Ingram that you remember?

13       A.    Mainly, just verbal abuse.   I mean,

14   just -- I mean, I don't -- I mean, I'll repeat it if

15   you'd like.

16           Always calling me a rat every night and day

17   when we doing kind of [sic] one another, or "Shut the

18   fuck up, piece of shit," things like that.   Excuse my

19   language, but...

20       Q.    I mean, you're quoting him, so it's --

21       A.    Like I say, I can't go precise.   I can't be

22   verbatim on days and months and what -- what

23   encounter it was.

24           But with Grainger and Ingram, there were

25   many, many encounters of verbal abuse.

```
 1        Q.    Uses of force or anything involving Ingram
 2   that you can remember?
 3        A.    No, no use of force involving Ingram.
 4        Q.    So it was just comments being made to you?
 5        A.    Right, right, correct.
 6        Q.    Okay.  All right.
 7              Anything -- anything else relating to any of
 8   those individuals that you can remember?
 9        A.    Not that I so much could recall.  Not that I
10   could recall at this moment.
11              I mean, something else may come to me if I'm
12   not under so much stress because I'm -- I'm sort of
13   nervous trying to get everything out, trying to
14   remember everything at one time, so -- but, again,
15   not at this moment.
16        Q.    Okay.  I appreciate it.
17              All right.  So now let's talk about
18   November 8th, 2022.  Okay?
19              Before we get there, though, something did
20   occur on November 4th, 2022, right?
21        A.    Yes.
22        Q.    So what happened then?
23        A.    November 4, 2022, I had a cellmate who,
24   during showers, he declared a PREA allegation.  He
25   made a PREA allegation against me.  Because my -- my
```

1    cellmate was Veillard and he declared a PREA.

2        A PREA investigation was conducted.  I was

3    taken to medical for a PREA assessment.

4        And he was removed from my cell.  He was

5    removed from the cell that I was in, which was

6    H2-219, to another cell.

7    Q.    And his name is Webens Veillard, right?

8        W-E-B-E-N-S is his first name and then

9    Veillard, which is V-E-I-L-L-A-R-D, right?

10   A.    Yes.

11   Q.    Okay.  And you said it was a PREA

12   investigation.  That's P-R-E-A, right?

13   A.    Yes.  It's Prison Rape Elimination Act.

14            (Stenographer requested clarification.)

15            THE WITNESS:  It's A acronym for Prison

16        Rape Elimination Act.

17   BY MR. KVERNE:

18   Q.    Okay.  What was the specific allegation on

19   November 4th?

20   A.    I never got the full details.  He made the

21   allegation.  I guess I was just a suspect, I guess.

22        So they don't tell me all the details of

23   what he alleged, so I wouldn't know what he said.

24   What he said I did, I don't know.  I mean, it was

25   just PREA.  He said I sexually assaulted him.  That's

1    all I know PREA means.

2        Q.   Okay.  So you don't know the specifics of

3    the allegations by Mr. Veillard.

4        A.   No, sir.

5        Q.   Okay.

6        A.   I know it's sexual assault, some sort of

7    sexual assault.

8        Q.   Now, during that time -- on November 4th,

9    2022, did you sexually assault Mr. Veillard?

10       A.   Sexual assault?  In what way?

11       Q.   I -- I don't know.

12            Did you -- did you touch him in any way that

13   was inappropriate?

14       A.   No, sir.

15       Q.   Did you make any statements to him in any

16   way that was inappropriate?

17       A.   I probably called him some names.

18       Q.   Okay.  Do you remember what kind of names

19   you may have called him?

20       A.   Queer, fag, things like that.

21       Q.   Okay.  Why?

22       A.   Because I was under the impression that he

23   were.

24       Q.   You were under the impression that he was

25   homosexual?

1    A.    Right.

2          And him being in my cell, I'm listed as a

3    gang member and we're not supposed to be housed with

4    homosexuals.

5    Q.    Okay.  What kind of gang member are you?

6    A.    Blood.

7    Q.    Okay.  You're a Blood?

8          Do you know if Mr. Veillard is in a gang?

9    A.    I don't know.  He's a Haitian and all the

10   Haitians love him.

11   Q.    The Haitians love what?  I'm sorry.

12   A.    Him.  I mean, he's Haitian.  You know,

13   foreigners stick together in here in prison.

14         So he's a Haitian and a lot of Haitians, the

15   Haitians in here, they have a gang considered a zone

16   mafia and they look out for their own people.

17   Q.    Okay.  All right.  And so you never touched

18   Mr. Veillard during any point.

19   A.    No, sir.

20   Q.    Never did anything other than make those

21   potential comments to him?

22   A.    No, sir.

23   Q.    Okay.

24         And you said you were taken out that same

25   day that he made that allegation or the day after?

1    A.    I was taken out -- I was taken to medical

2  for a PREA assessment by the medical that same night.

3    Q.    Okay.  And the PREA assessment that they

4  did, what did they do for the PREA assessment?

5    A.    Asked me questions:  Did he fondle me?  Was

6  there any DNA?  Things like that.

7    Q.    So they asked you those questions even

8  though he's the one that claimed it?

9    A.    Correct.

10    Q.    Okay.  Did they take any -- did they like

11  swab your hands or do anything like that with you?

12    A.    That, I can't recall if they did.  I mean,

13  my DNA is already on file with the Department of

14  Corrections, so I wouldn't -- I don't think, but I

15  can't remember.  I can't remember if they did or

16  didn't.

17    Q.    Okay.  And then after that medical PREA

18  assessment, where did you go after that?

19    A.    I went back to my cell.

20    Q.    Okay.  Which cell was that?  I'm sorry.

21    A.    H2 -- H -- I think it was H1-219, if I'm not

22  mistaken.

23    Q.    That was the same cell that you had been in

24  previously?

25    A.    With Veillard?

1    Q.    Yes.

2    A.    Yes, correct.

3    Q.    Okay.  So they moved Mr. Veillard out, but

4    they put you back in that cell.

5    A.    Correct.

6    Q.    Okay.  And you remained in that cell to

7    November 8, 2022, correct?

8    A.    Correct.

9    Q.    Okay.  Now, November 8, 2022, what happened

10   during that incident?

11   A.    Such as?  Could you be -- elaborate?  Like

12   what do you mean?  Like --

13   Q.    So -- okay.  So you were in a cell, right?

14        And did they eventually bring Mr. Veillard

15   to the cell?

16   A.    No, they didn't.

17   Q.    Okay.  So what happened?

18        What did they -- you were pulled out of your

19   cell?

20   A.    Correct.

21   Q.    Okay.  You were pulled out of your cell.

22        And where were you taken?

23   A.    I was taken to the shower at first.

24   Q.    Okay.

25   A.    Taken to the shower.

1    Q.    All right.  And --

2    A.    Shower.  Shower, ma'am.  To the shower.

3  Sorry about that.

4    Q.    Where -- why were you taken to the shower?

5    A.    I don't know.  They told me to pack my

6  belongings and cuff up, I said [sic] remove the hand

7  restraints.  I was under the impression that I was

8  being released from confinement, but they placed me

9  in the shower instead.

10    Q.    Okay.  So you talked about this earlier.

11  This -- you were in H dorm.  That cell was an H dorm

12  cell and that's the confinement wing at Jackson,

13  right?

14    A.    Correct.

15    Q.    So while you were originally with

16  Mr. Veillard, you were both -- you were at least in

17  confinement.

18         Do you know what status Mr. Veillard was

19  under?

20    A.    No, I don't.

21    Q.    Okay.  But you were at least in confinement

22  on November 4th, 2022.

23    A.    Yes.

24    Q.    Okay.  So they took you, they had you pack

25  up your belongings and they took you to the shower.

1          You were still handcuffed when they placed

2     you in this shower or did they remove the cuffs?

3          A.    I was -- I was taken out of cuffs --

4          Q.    Okay.  And your property --

5          A.    -- before I was placed in the shower.

6          Q.    And your property was with you in the room

7     or where was it?

8          A.    My property was outside the shower.

9          Q.    So just outside the shower?

10         A.    Yes.

11         Q.    Okay.  So they placed you in the shower,

12    basically, as kind of like as a temporary holding

13    cell?

14         A.    Correct.

15         Q.    Okay.  How long did you remain in the shower

16    there?  Do you remember?

17         A.    Can't remember.  It was no longer than a

18    hour.

19         Q.    Okay.  Eventually they came back and they

20    got you, right?

21         A.    Correct.

22         Q.    Okay.  And when they came back and got you,

23    did they place handcuffs on you?

24         A.    Yes.

25         Q.    And then what happened next?

1      A.    They proceeded to escort me to another wing.

2            And I was asking -- I thought I was being

3      released from confinement.

4            They informed me that no, this was an

5      in-house move, I'm not being released from

6      confinement and they proceeded to take me to Wing 2.

7            And I asked who were my -- "who was my

8      bunkie?"

9            They told me it was a good guy.  "He's okay.

10     You'll be all right."

11           And once we got to the cell door and I

12     looked in, I observed that it was Veillard.

13           And I explained to Grainger, Ingram and

14     Causey, I could not go in the cell with Veillard due

15     to a PREA investigation that was going to be special

16     review.  I was afraid.  Told them that he was going

17     to kill me if I go in there.

18           They made the derogatory statements:  It's

19     my turn to be molested.  Take it like a man.  Stop

20     being a coward.  Things of that nature.  This is what

21     happens to snitches.  You like to write grievances,

22     well, it's like that.

23           I mean, this coming from Grainger, Causey

24     and Ingram collectively.

25     Q.    Okay.  So I want to break down basically

```
 1   what you just described a little bit, okay?  Just a
 2   little bit more in detail.
 3           So you were escorted to, you said, Wing 2,
 4   right?
 5       A.   Correct.
 6       Q.   From wing -- from Wing 1.
 7       A.   Correct.
 8       Q.   And that was H dorm still?
 9       A.   Correct, yes.
10       Q.   Still a confinement dorm.
11       A.   Yes, sir.
12       Q.   Okay.  And then you were -- during the
13   escort you talked with -- who was escorting you?
14       A.   Causey escorted me to the shower and it was
15   Grainger and Ingram from there.
16       Q.   So Causey escorted you to the shower, right?
17       A.   Correct, yeah.
18       Q.   So let's talk about that real quick.
19           During the escort to the shower, before you
20   were placed in the shower, did you have any
21   conversation with Mr. Causey?
22       A.   It wasn't really a conversation.  He made a
23   statement.  He made a statement, I can't remember
24   exactly what it was.  I would have put it in the
25   grievance if I had.
```

1      He made a derogatory statement, which I had

2  gotten used to by that time because they're making so

3  much.  I mean, they say whatever comes to their mouth

4  without a filter.

5      So he made a statement, I shrugged it off,

6  went in the shower and did what I did.

7      Q.   Okay.  And then Causey walked away?

8      A.   For that moment, yes.

9      Q.   Okay.  And then you said within an hour

10  Ingram and Grainger came and picked you up, right?

11      A.   Correct.

12      Q.   Was your property being taken with you --

13      A.   Yes.

14      Q.   -- at this time?

15      A.   Yes.

16      Q.   Who was carrying your property?  Do you

17  remember?

18      A.   Can't remember.  I think I was made to carry

19  my property.

20      Q.   Okay.  When you were cuffed, how were you

21  cuffed, in the front or the back?

22      A.   Back.

23      Q.   Okay.  And did you have any other restraints

24  on?

25      A.   No leg restraints.

1    Q.    No leg restraints.  So it was just
2  handcuffs, right?
3    A.    Yes, sir.
4    Q.    And then you get escorted by Grainger and
5  Ingram.
6          And during the escort you ask them who
7  you're going to be bunked with.
8    A.    Right.
9    Q.    And they tell you he's a good guy and
10  there's no issues, right?
11    A.    Correct.
12    Q.    Any other conversation?
13    A.    Grainger made a statement referring to me
14  writing grievances.  I didn't think that it had
15  anything to do with the move.  He literally just made
16  it out of the blue while we were walking.  "Well, you
17  like to write grievances and we'll show you how we
18  deal with snitches."
19          And I didn't think nothing of it.  I kind of
20  shrugged that off.  Because, like I said, this is
21  daily.  This is daily stuff that this type of stuff
22  happens, they say things like this.
23    Q.    Did you say anything in response to that?
24    A.    Excuse me?
25    Q.    Did you say anything in response to that?

1      A.    No, I didn't.

2      Q.    Okay.

3      A.    I was still -- I was basically focused on

4  who I was going into the room with.

5      Q.    Okay.  All right.

6            So then you get escorted to the room.  Do

7  you remember which room it was?

8      A.    Yes, it was H2-201.

9      Q.    Okay.  So this was a different room from the

10  November 4th room.

11      A.    Correct.

12      Q.    Okay.  So you get to the front of the room

13  and what happens there?

14      A.    That's when I look into the cell and I see

15  Veillard inside the cell.

16            And I told them I couldn't go in there.  I

17  panicked.  I told them I couldn't be in that cell.

18      Q.    So you told Grainger and Ingram that you

19  couldn't go inside the cell.

20      A.    Correct.

21      Q.    Did you say anything to Veillard?

22      A.    No.  He was sleep.

23      Q.    He was asleep, so he didn't say anything

24  either.

25      A.    He didn't see me at this moment.  He was on

1     the bunk sleep.  At least I guess he was sleep.

2         Q.    Okay.  Did the officers say anything to him?

3         A.    They finally woke him up.

4         Q.    How did they wake him up?

5         A.    They like got in the bed.

6               When he looked up and seen me, he seen me

7     and the officers and that's when he made a statement

8     that I -- I was the one who he alleged PREA on, I'm

9     the one that allegedly sexually assaulted him, yadda,

10    yadda, yadda.  If I come in there, what he's gonna

11    do.

12              He asked them not to place him in there --

13    he asked them not to place me in there.  And they

14    still did.

15        Q.    Okay.  And when they -- when they -- so he

16    asked them not to place you in there, as well, is

17    what you're saying.

18        A.    Correct.

19        Q.    Okay.  And then what happened next after

20    that?

21        A.    They still forced me in the cell after

22    making several -- many comments.  Get your bitch, get

23    his ass in there and fuckin' fight, things of that

24    nature.

25                    THE WITNESS:  Excuse my language,

```
 1           Ms. Stefanick.
 2                Things of that nature.
 3                They forced me in the cell.
 4                Once inside of the cell, Veillard, he
 5           snapped.  He started fighting.  He attacked me
 6           while I was still in handcuffs.
 7                I don't know which one, was it Grainger,
 8           Ingram or Causey, I don't know which one it
 9           were, was trying to get the handcuffs off.  I'm
10           presuming they were trying to get the handcuffs
11           off and they struggled with the handcuffs while
12           I was getting beat on.
13                And then I finally -- they finally got the
14           handcuffs off and I tried to defend myself in
15           there.
16  BY MR. KVERNE:
17      Q.   All right.  So, break down a little bit more
18  what you just said.  All right?
19                So you get to the front of the cell.
20  They -- the statements are exchanged, right?
21                And then they place you inside the cell,
22  correct?
23      A.   Correct.
24      Q.   And which officers are standing at the cell
25  at that point?
```

1    A.    Grainger and Ingram for sure.

2          Causey, he was back and forth throughout the

3    wing.  I mean, the wing is not but so big.  He's back

4    and forth doing other things, talking to other

5    inmates.  He'll pass by and look in and say things

6    and walk off.

7    Q.    Okay.  But he wasn't specifically like

8    standing right there while you were being placed

9    inside the cell, if you remember.

10   A.    At one moment, Causey did pull up.  Causey

11   did come forth and stand at the cell at one moment

12   and then he walked off again.  He made some

13   statements and walked off again.

14   Q.    Okay.  What kind of statements did he make?

15   A.    Something along the lines of my turn to be

16   fucked or my turn to be screwed or molested or

17   something along those lines.  It's my turn.

18   Q.    Okay.  How long did he stand at the cell

19   when that --

20   A.    Once they were putting me in the cell,

21   once -- once I was went into the cell I couldn't see

22   anything behind me, of course not, but -- so I'm not

23   sure how long he stood there after I was placed in

24   the cell.

25   Q.    Well, what about when -- okay.

1          So when he came up and made that statement,
2    where were you?  Were you inside the cell yet or were
3    you just --
4        A.    Not yet.  I was still at the -- I was still
5    at the cell, trying not to be forced inside the cell.
6        Q.    Okay.  How long did he stand there and make
7    that statement?  A couple minutes?
8        A.    He made that statement --
9              (Stenographer requested clarification.)
10       Q.    Yes.
11       A.    I'm not sure how long it was.
12             Like I said, when we walked up I was
13   going -- when he walked up, the door was open.  I was
14   going into the cell.  He made the statement as
15   I -- as the door was opening type-ish.  And once I
16   was in the cell, I couldn't see how long he stood
17   there after that.
18       Q.    Okay.  And then --
19       A.    I was going to get -- get my ass whooped.
20       Q.    And then the -- you were placed inside the
21   cell and the door was closed, right?
22       A.    Right.
23       Q.    Okay.  And what happened next after the door
24   was closed?
25       A.    He attacked me.  Veillard attacked me.

1    Q.    All right.  But before -- well, like
2    immediately, or did you put your hands through the
3    cuffing portal first?
4    A.    Yeah, my hands were -- yeah, as soon as I
5    put my hands through the cuffing portal --
6    Q.    Okay.
7    A.    -- the attack --
8    Q.    So they closed the door, right?
9         They opened -- the officers opened the
10   cuffing portal, you placed your hands through and
11   then they -- and then he attacks you; is that
12   correct?
13   A.    As they were proceeding to remove the
14   handcuffs, yes.
15   Q.    Okay.  So while they have your -- who was
16   uncuffing you, do you know?
17   A.    No, sir.
18   Q.    Okay.
19   A.    I presume it was Ingram because he was
20   the -- what do you call it?  He was the alpha.  I
21   would list -- I would label him as being the alpha at
22   that moment.  He was like -- he was more like what
23   you refer to as the big dog.  And he's -- I presumed
24   it was Ingram that was doing the handcuffs.
25   Q.    Okay.  And he was -- he was -- one of the

1   officers, presumably Ingram, was removing the

2   handcuffs from you.  Did they eventually get the

3   handcuffs off?

4       A.   Yes, sir.

5       Q.   Okay.  But prior to the handcuffs getting

6   off, Veillard came up and attacked you.  What did he

7   do to attack you?

8       A.   In the midst, in the midst of him removing

9   the handcuffs, Veillard attacked me, started swinging

10  and punching on me and kicking and stuff like that.

11      Q.   Okay.  Where was he punching and kicking

12  you?

13      A.   Top of the head.  I had ducked my head.  So

14  basically top of the head, shoulders, back.

15      Q.   Okay.  How long did it take the handcuffs to

16  come off, do you know?

17      A.   Not long.  Probably -- I can't give

18  approximate.  Seconds.  Seconds, not minutes.

19      Q.   Okay.  So seconds it took the handcuffs to

20  come off?

21      A.   Yeah, seconds.  So it could be probably

22  30 seconds, 20 some seconds, something like that.

23      Q.   I'm assuming they removed one handcuff off

24  of one hand, right?

25      A.   Correct.

 1      Q.    The hand that became free, what did you do
 2   with that hand?
 3      A.    I used it to protect myself.
 4      Q.    Okay.  And then you still had the
 5   other -- do you remember which handcuff came off
 6   first?
 7      A.    I want to say it was the left.  I'm not --
 8   don't -- I don't want to be quoted on that.  I'm not
 9   sure, but I want to say it was my left hand.
10      Q.    Okay, so left hand.
11            From your recollection, left hand is free.
12   You come up, and I'm assuming you start protecting
13   your face or your body or something?
14      A.    Correct, correct, my face.
15      Q.    And then a couple seconds later they remove
16   the right handcuff?
17      A.    Correct.
18      Q.    And then now you're totally free.
19      A.    Correct.
20      Q.    They pull the handcuffs through, shut the --
21   they shut the portal --
22      A.    Right.
23      Q.    -- right?
24            Okay.  And now, what's happening now?
25      A.    What's happening now is I fall.  I remember

 1   falling, kind of blacked out for a second, for a

 2   minute.

 3         When I came to, he was still yelling and

 4   screaming:  "I'm going to kill you, I'm going to kill

 5   you.  Y'all better come get him."  Yadda, yadda,

 6   yadda.

 7         And I finally got up.  And when I was trying

 8   to get up, he attacked me again and that's when he

 9   proceeded to fight.  That's when it turned into a

10   physical altercation between both of us.

11   Q.   Okay.  Did either of you have any weapons or

12   anything?

13   A.   No, sir.

14   Q.   Okay.  So it was just -- it was a fistfight,

15   right?

16   A.   Yes, sir.

17   Q.   Okay.

18   A.   It was an attack rolled over into a

19   fistfight, yes.

20   Q.   Okay.  How long did this entire thing go on?

21   Do you remember?

22   A.   It went on for a while.  Approximately, I

23   would say, 40 minutes.

24   Q.   Okay.  So 40 minutes is how long --

25   A.   That's my -- excuse me, but that's my --

1    like I said, I didn't have no watch.  I wasn't timing

2    it.  But it was a long time because Grainger -- I'll

3    let you get to that part, but we had a few pit stops

4    along the way.

5         Q.   Okay.  So you mean pit stops is like

6    separate rounds, like --

7         A.   Yeah.

8         Q.   -- like a boxing match?

9         A.   Correct, correct.

10        Q.   Okay.  All right.  We'll talk about that in

11   a second, but -- okay.

12             So while you're fighting, how long did the

13   first -- I guess, first round go?  If you remember.

14        A.   I can't -- I can't -- I can't be precise on

15   the exact amount of time because Grainger, Ingram --

16   Grainger, Ingram and Causey, one of those came to the

17   door and looked in the door and kind of like

18   encouraged the fight to continue.  They encouraged

19   him to continue beating my ass or they wanted to see

20   some action and we were stopped.

21             And I'm like, "Man, get me out of here, get

22   me out of here," and they would not get me out of the

23   cell.

24             They stood at the cell, guys smirking,

25   laughing and trying -- trying to get us to continue

1  to fight so they could see us fight.

2      Q.    Okay.  Did any of them call any backup or

3  anything, from your recollection?

4      A.    No, sir.

5      Q.    Any of them have a radio?

6      A.    Yeah.

7      Q.    Which one?

8      A.    All of them had radios.  They supposed to

9  have radios any time they're on the floor.

10     Q.    And it's your understanding that none of

11 them called for backup during that period of time.

12     A.    No.

13     Q.    Okay.  And then the first fight happened,

14 they made statements to you, right?

15        And then what happened after that?

16     A.    After they walked away, we -- Veillard seen

17 that they would not remove from the cell, so he

18 continued to attack, continued to fight.

19     Q.    Okay.  So the officers walked away, right?

20     A.    Yes.

21     Q.    All three of them walked away or just how

22 many were there?

23     A.    I mean, they were coming, like ones and twos

24 at a time, looking through the window, standing there

25 and laugh, smirk.  So they were coming like ones and

1    twos, so it wasn't like all three of them had their

2    head in the window at one time.  Not like The Three

3    Stooges or anything like that.

4          It was like one or two would peek their head

5    in, they looked, smile, did that, get at that [sic],

6    let me see, things like that.  They walk away.

7    Q.    But they were -- there was at one point all

8    three officers were standing outside the cell or was

9    it just two at any point at most?

10   A.    You mean throughout the 40 minutes?

11   Q.    Yeah.

12   A.    No, I don't -- I don't think.  Like I say, I

13   can't see outside the door, so I wouldn't know if all

14   three was at the door at one time.  I can't.

15   Q.    What about during -- what about during the

16   first fight, were all three present at that point or

17   only two of them?

18   A.    Can't see out the door.  I was too busy

19   getting my butt whooped.  I tried not to.

20   Q.    Okay.  So you said that at that point the

21   officers that were at the door during the first fight

22   walked away and you two were continuing to fight --

23   A.    Right.

24   Q.    -- right?

25         Then officers would come, either one or two

1  at a time, and come back, make statements, and you

2  two were -- just continued to fight?

3      A.    Not while they were at the door.  We were

4  trying to get them -- I was trying to get them to let

5  me out.

6          He would say, "Get him out of here," things

7  like that, while they were at the door.  We wouldn't

8  fight.

9      Q.    So both of you were trying to say "we want

10  to leave."

11      A.    Right.  "Get him out of here" or, yeah, I

12  was screaming, "Hey, get me out of here, one way or

13  another."

14      Q.    Why didn't the two of you just stop

15  fighting?

16      A.    I just told you we did.  When they came to

17  the door, there was negotiation.

18          Hey, get us out of here, get me out of here,

19  yadda, yadda, yadda, while we were both covered in

20  blood.

21          We were showing them blood, like, "Hey, man,

22  get me out of here, man.  Get me out of here, please.

23  Please get me out here.  He's going to kill me."

24          There's blood everywhere.  You can't help

25  but to see what's going on.  I got a bite mark on my

1    stomach where I'm bleeding from.  There's blood all

2    over my pillow.  There was blood over his boxers.

3    There's blood all over the cell.

4        Q.    And that was after 40 minutes or was that --

5        A.    This was before 40 minutes.  This was after

6    the first fight.

7        Q.    But then after that, did you continue to

8    fight?

9        A.    After that, yes.

10       Q.    Why?

11       A.    Because when the police left, he continued

12   to kick my ass and I had to defend myself.

13       Q.    So he continued to attack you?

14       A.    Yeah.  Because he see that they wouldn't get

15   me out of the room, so he continued to get on my ass

16   and I had to defend myself.

17       Q.    Okay.  So Veillard continued to attack

18   you --

19       A.    Correct.

20       Q.    -- each time.

21       A.    Correct.

22       Q.    Was he making any statements to you while he

23   continued to attack you?

24       A.    I wasn't paying attention.  He was, but I

25   wasn't listening.  He's Haitian, so he was speaking

1   Creole or some crap.  I couldn't listen -- I couldn't

2   understand it.

3       Q.   Okay.  And this went on, officers would come

4   and go multiple different times for a period of what

5   you believe was 40 minutes, but you're not certain,

6   right?

7       A.   Correct, correct.

8       Q.   Okay.

9       A.   It was a while.  It was a long time.

10      Q.   Okay.  And when the officer would come to

11  the cell, the two of you would stop fighting and try

12  to tell them, We want to come out of the cell?

13      A.   I mean, we would notice -- we would be

14  fighting and we wouldn't even know that they were at

15  the door until one of us would look up.

16           Like, I would look up I would try to get

17  free, like, "Let me go."

18           And I'd run to the door, "Hey, get me out of

19  here, get me out of here."

20      Q.   And then he would just let you go and you'd

21  be able to talk with the officer?

22           (Stenographer requested clarification.)

23      Q.   And they would let you go -- and they would

24  let you go and you'd just be --

25      A.   He would --

1                THE COURT REPORTER:  Excuse me,

2        MR. Wilson.

3   BY MR. KVERNE:

4        Q.    And you would just be able to go and talk

5   with the officer?

6        A.    Okay.  I would force myself, Miss.  It

7   wasn't that he would let me go.  I would get away

8   from him, push him off me and then I'd run to the

9   door, with my back to the door, not looking directly

10  at the officer but watching him, and in a -- in a

11  manner of, what you call it?  Square off.  You

12  want --

13       Q.    Like a standoff between the two of you?

14       A.    Right, right, right, right, right, right,

15  something like that.

16             And that's when I would be -- we would both

17  be, Hey, man, let me out of here, let me out of here,

18  while looking back, trying to look both ways, watch

19  him and watch the officer, make sure they didn't walk

20  away.

21       Q.    Okay.  And both of you would just stop

22  fighting and would be saying, Please let us out of

23  here?

24       A.    Correct.

25       Q.    Okay.  And then the officer would walk away

1    and then you'd get back to fighting again?

2        A.    Yes, sir.

3        Q.    Okay.  And this went on, this entire thing

4    went on for about 40 minutes.

5        A.    Yes, sir.

6        Q.    Okay.  After 40 minutes, what happened?

7        A.    Lieutenant Oliver finally came making his

8    rounds.  He looked in.  Once he looked in, we tried

9    to get him to stop the fight.

10           He made a statement something along the

11   lines of, You gotta deal with it because -- I mean,

12   I'm presuming this, but so many inmates get forced in

13   their room with other inmates that it became

14   their -- it became the norm for them to force inmates

15   in the room with others and they would try to get

16   out.  It was, like, Oh, you just gotta deal with it.

17           So I'm going to have to deal with it.

18           Walked away.  And I think he finally came

19   back and that's when they informed me that I wasn't

20   supposed to be in that cell.

21       Q.    Okay.  So let's break this down a little

22   bit.  So after about 40 minutes, Lieutenant Oliver

23   comes, right?

24       A.    Correct.

25       Q.    And he made statements to you like "you're

1    just going to have to deal with it."

2        A.    Yes.

3        Q.    Deal with the fact -- okay.

4              So he did not pull you out of the cell

5    immediately --

6        A.    No, sir.

7        Q.    -- right?

8        A.    No, sir.

9        Q.    Who else was present?  Was there anyone

10   present?

11       A.    Not that I seen.

12       Q.    Just Lieutenant Oliver?

13       A.    Correct.

14       Q.    Okay.  And then how did Lieutenant Oliver

15   become aware of the situation, do you know?

16       A.    I'm guessing that he was doing his security

17   rounds.  The white shirt, the white shirt conducts

18   security rounds once a day at least while they're

19   confined in the -- our units.  And I'm guessing that

20   he was doing security rounds.

21       Q.    Okay.  So Lieutenant Oliver comes up and

22   says, "You guys have to figure it out," right?

23             Is that correct?

24       A.    To deal with it.

25       Q.    To deal with it, sorry.

1          Then walks away, you said, right?

2     A.   Correct.

3     Q.   While he walked away, what happened?

4     A.   You mean what happened where?

5     Q.   Did you and Veillard begin to fight again?

6     A.   Not immediately.  Once we seen that

7  Lieutenant Oliver at that moment wasn't getting me

8  out of there, then we started back.  He -- we started

9  back fighting.

10    Q.   Okay.  Who attacked who in that situation?

11    A.   He attacked me again.

12    Q.   Okay.  So each and every time he attacked

13 you.

14    A.   Correct.

15    Q.   All right.  And then did -- you said Oliver

16 eventually came back, correct?

17    A.   Correct.

18    Q.   About how long?

19    A.   Not sure how long it was before he came

20 back.  He eventually came back, and I want to say

21 that's when he informed me that I wasn't supposed to

22 be in that cell.

23    Q.   Okay.  So it was a couple minutes?  Hour?

24    A.   No, it was longer.  It was longer than a

25 couple minutes.

```
 1        Q.    Shorter than an hour, though, right?

 2        A.    Yeah, shorter than an hour.  Shorter than an

 3   hour.

 4        Q.    30 minutes?

 5        A.    Less than 30.  Between 10 -- between 10 and

 6   30.

 7        Q.    Okay.  He comes back, he informs you of

 8   that.  Are there any other officers with him?

 9        A.    I think Causey.

10        Q.    Causey was with him?

11        A.    I -- I think.  I think.  I don't want to say

12   for sure.  I think it was Causey.  I want to say it

13   was Causey who told me to pack up, pack my

14   belongings, you weren't supposed to be in there,

15   yadda yadda yadda, you're moving.  He and came to

16   pack me up and move me out of the cell.

17        Q.    Okay.  So Causey came and got you.

18        A.    Yes.

19        Q.    Okay.  And that was immediately when the

20   lieutenant came back and told you that you were not

21   supposed to be in that cell?

22        A.    That wasn't immediately, but right around

23   the time.  It wasn't immediately.

24        Q.    Okay.  And you were removed from that cell

25   at that point, right?
```

```
 1      A.    Correct.

 2      Q.    Where did you go?

 3      A.    He took me to H1, I think, 208.  I think

 4   H1-208.

 5      Q.    Okay.  So he took you back because you were

 6   in dorm two, right?

 7            Did he take -- or Wing 2.  Was that Wing 2

 8   or Wing 1?

 9      A.    He took me back to Wing 1.

10      Q.    Took you back to Wing 1.

11            And that was not the original cell that you

12   were in before this incident.

13      A.    No, sir, it wasn't.

14      Q.    Okay.  So he took you to that cell.

15            When you were taken out of the cell with

16   Veillard, were you handcuffed?

17      A.    Yes.

18      Q.    How were you handcuffed?

19      A.    I think behind the back.

20      Q.    Behind the back, okay.

21            And where was your property during this

22   time?

23      A.    Property was with me.

24      Q.    Was with you.

25      A.    Yeah.
```

1    Q.   Okay.  And you said you believe it was
2  Causey that took you to the cell.  He carried your
3  property or how was your property transported?
4    A.   I think I -- I think I carried my property.
5  I can't remember the details about who carried the
6  property, but I think I did, if I'm not mistaken.
7  Not entirely sure, but I think I carried my property.
8    Q.   All right.  You arrive at H2-108, right, is
9  what I think you said?
10   A.   H1-208.
11   Q.   H1-208.
12   A.   Yes.
13   Q.   Okay.  You arrive there and you're placed
14 back in the cell?
15   A.   I'm placed in a cell with another
16 individual, yes.
17   Q.   Okay.  Who was that individual?
18   A.   Daniels.  Daniels.
19   Q.   Last name Daniels?
20   A.   Yes.
21   Q.   Can you describe him for me?
22   A.   Aaron, Aaron Daniels.
23   Q.   Aaron Daniels?
24   A.   Yes.
25   Q.   Can you describe what he looks like for me?

1    A.    Approximately 5'6", 5'7", probably 5'8".

2  Between 5'6" and 5'8", probably 160 something pounds,

3  I guess.  Small build, slight figure, slender.

4    Q.    Okay.

5    A.    African-American.

6    Q.    Okay.

7    A.    Male.

8    Q.    All right.  When you're in the cell with

9  Mr. Daniels, was anything said between you and him?

10    A.    As far as what?

11          I mean, of course we --

12    Q.    I mean, did he ask you any questions?

13          Did he ask you anything?

14          Did you communicate anything to him?

15          It doesn't necessarily have to be negative,

16  just anything.  Did you talk to him about anything?

17    A.    I mean, we talked about the incident.

18    Q.    Okay.  What did you say to him?

19    A.    I just got my ass beat.

20    Q.    Okay.  And what did he say in response?

21    A.    "By whom?"

22          (Stenographer requested clarification.)

23              THE WITNESS:  By whom.

24  BY MR. KVERNE:

25    Q.    All right.  And what was -- just tell me

1    what the conversation.  How did the conversation go?

2        A.   I mean, that was just part of the

3    conversation.  We didn't get hooked on just that.  I

4    mean, we talked about many things while we were in

5    the room together.

6        Q.   Right.  But what I'm saying is -- okay.

7             So was the first thing you guys talked about

8    the fight that had just occurred?

9        A.   Right.

10       Q.   Okay.  So how did the conversation about the

11   fight that just occurred, how did that go between you

12   and the --

13       A.   Because he -- he saw me, that I was getting

14   out of confinement.  When he saw, he could look

15   across the hall and see when I originally moved when

16   I was in 219.

17            And that's when he asked me, like, Damn,

18   what happened?  Why you didn't get out?

19            And I told him, "I was never getting out."

20            They moved me to another cell with a guy who

21   stay in PREA [sic].

22            And we conversed about that back and forth

23   and everything, like, what happened?

24            And I'm like, Beat my ass and I moved.  I'm

25   like Zo.  They refer to him as Zo.  I'm like Zo beat

```
 1  my ass.
 2          Then they came and got me for medical.
 3      Q.   Okay.  So your understanding is Veillard's
 4  nickname is Zo?
 5      A.   Yeah.  All Haitians -- all Haitians are
 6  referred to as Zo.
 7      Q.   So regardless of who it is, any Haitian
 8  person, you refer to them as Zo.
 9      A.   I do.
10      Q.   Okay.  All right.  And that was the end of
11  that conversation?
12      A.   Until they came and got me for medical.
13      Q.   Okay.  And who came and got you to go to
14  medical?
15      A.   Again, I want to say it was Causey.  I can't
16  recollect right now, but I want -- I'm thinking it
17  was Causey.
18      Q.   How long were you in that cell with
19  Mr. Daniels, do you remember?
20      A.   Prior to the medical?
21      Q.   Yeah.
22      A.   Maybe for a hour.
23      Q.   So at most an hour?  Less than an hour?
24      A.   Hour-ish.  Somewhere around an hour.
25      Q.   Okay.  Somewhere around an hour, all right.
```

1          And you were in the cell for somewhere
2    around an hour and then you believe that Causey came
3    and picked you up.
4        A.   Right.
5        Q.   All right.  Do you know if anything happened
6    with Mr. Veillard during that hour period of time?
7        A.   No, I don't know.  He was in another wing.
8        Q.   Okay.  So then Causey came and picked you
9    up.  Did he place handcuffs on you?
10       A.   Yes.
11       Q.   How were you handcuffed again?
12       A.   Yeah, he placed handcuffs on me.
13       Q.   How were you handcuffed?
14       A.   In the back.
15       Q.   Okay.  In the back.
16            Any other restraints?
17       A.   No.
18       Q.   Okay.  So he placed handcuffs on you.  And
19   you said he came to pick you up for medical?
20       A.   Yes.
21       Q.   Okay.  And when you -- when you -- took you
22   to medical, did you exchange any conversations with
23   Causey?
24       A.   No, I didn't.  He said what he said.  I
25   mean --

1      Q.    What did he say?

2      A.    "You got what you were looking for," but in

3    an antagonistic manner.

4          "You got what you're looking for, huh?"

5    Things like that.  That was it.  And he dropped me

6    off at medical.

7      Q.    Anything else?

8      A.    Sure.  I can't word him verbatim and I don't

9    want to get, hey, what you say he said and I -- I'm

10   not sure.

11         It's like things that I'm not familiar with.

12   It's not my type of sling.  His sling is different

13   and my type of sling is shit that he -- stuff that he

14   said is kind of corny, so I'm not going to remember

15   exactly like what he said.

16     Q.    Okay.  That's fair.

17         And then you were taken to medical, right?

18     A.    Correct.

19     Q.    Okay.  How far is medical from H dorm?

20     A.    There's a medical room that they use inside

21   the dorm that's a little closet-like room that they

22   use for medical.

23     Q.    Okay.

24     A.    It's right inside the court.  I mean,

25   it's --

```
 1      Q.   Is that closer to H1 or H2?

 2      A.   It's closer to H1.

 3      Q.   Okay.  Keep going.

 4      A.   Probably three seconds away from H2.

 5           No, it's right there.

 6           So he took me and took me to medical,

 7   dropped me off and he left.

 8           I went in to see medical where Mr. Ingram

 9   was present along with the nurse.  And Lieutenant

10   Oliver was present.

11      Q.   Okay.  So you get escorted there.  Did they

12   have a hand-held camera on you at any point during

13   this, or no?

14      A.   No, they did not.

15      Q.   Okay.  So you get escorted to medical and

16   you get taken inside medical.  And you said Causey

17   was there, right?

18           Ingram.  Causey was escorting you.  Ingram

19   and then a Lieutenant Oliver.  A. Ingram and

20   Lieutenant Oliver were already inside the medical

21   room.

22      A.   Yes.  B. Ingram.

23      Q.   I'm sorry, what?

24      A.   You said A. Ingram?

25      Q.   Okay, my mistake.  Ingram and Oliver were
```

 1  already inside the room.

 2      A.   Correct.

 3      Q.   Okay.  And was there a nurse inside the room

 4  too?

 5      A.   Yes.

 6      Q.   Was it just one nurse or were there multiple

 7  nurses?

 8      A.   It was only one nurse.

 9      Q.   Only one nurse, okay.  Which nurse was it?

10      A.   I do not know her name.

11      Q.   Can you describe her for me?

12      A.   Heavy set.  Caucasian.  I refer to it as

13  Russian.

14      Q.   You refer to her as Russian?

15      A.   Yeah, I mean --

16      Q.   Why?

17      A.   Most females that size come out of Russia.

18           (Stenographer requested clarification.)

19               THE WITNESS:  Excuse me.  This is no

20           offense to you, Miss Stefanick.  Most women that

21           size come out of Russia or of Russian descent.

22           I mean, she's a big girl.

23  BY MR. KVERNE:

24      Q.   How tall is she?

25      A.   She's tall.

1    Q.    Like over six foot?

2    A.    Approximately.

3    Q.    Okay.  All right.  And then she gets in the

4  room and what happens in the room?

5    A.    She's already in the room when I came in.

6    Q.    Okay.  What happens when you enter the room?

7    A.    She asked me did I have any medical injuries

8  that I wanted to report.  She was -- she informed me

9  that she was here for a medical assessment.

10        She asked me did I have any injuries that I

11  wanted to report and I explained to her yes.

12        She asked me where, and I began to show her

13  the bite mark and other wounds.

14        Lieutenant -- Ingram, Sergeant Ingram, he's

15  a lieutenant now.

16        Sergeant Ingram made a statement like, Wait,

17  wait, wait.  Before you do that, I want to let you

18  know what's going to happen.  If you report that, I'm

19  going to keep you in confinement longer and I'm going

20  to make sure I kick your ass and all kind of other

21  threats.  If I report it, then I wouldn't be getting

22  out of confinement the next day.  Then I was going on

23  H because I was scheduled to be released from

24  confinement.

25        So he told me, Shut up."  Said, "Shut the

1    fuck up.  Don't mention nothing.  We're just making

2    it look good for the camera."

3            I could tell that the nurse was frustrated.

4    She wanted me to tell everything.  And I been through

5    too much with --

6                (Stenographer requested clarification.)

7                THE WITNESS:  I've been through too much

8            with DOC that when they make statements like

9            that, that was a threat.

10   BY MR. KVERNE:

11      Q.   So you just didn't report your injuries to

12   the nurse.

13      A.   To the nurse, yeah.  She filled out the

14   papers.  She was like, Well, I'm done.  She left.

15      Q.   Okay.  So the individuals that were in the

16   room, just so we're clear, were Lieutenant Oliver,

17   Ingram, and then the other individual was Causey?

18      A.   No.  The nurse.  Causey wasn't present.

19      Q.   Causey was not present?

20      A.   No, he wasn't.

21      Q.   Okay.  So he just escorted you there,

22   dropped you off and then walked away?

23      A.   Correct.

24      Q.   Okay.  So the only individuals in the room

25   were the nurse, yourself, Lieutenant Oliver and

1    Ingram.

2        A.    Yes, sir.

3        Q.    Okay.  When Sergeant Ingram made that

4    statement that you just described, did Oliver say

5    anything?

6        A.    Oliver attempted to say something.  He

7    attempted to say something, but I could tell that

8    Ingram was running the show.

9              Because Oliver attempted to like encourage

10   me to report my injuries, but Ingram was like, No,

11   no, this is how it's going to go.  And he basically

12   boasted the -- he boasted the show and took over and

13   Oliver just remained mute.

14       Q.    So despite the fact that Lieutenant Oliver

15   is a superior officer, Sergeant Ingram was the one

16   that made the decision to tell you not to report your

17   injuries.

18       A.    Yes, sir.

19       Q.    Did the nurse say anything?

20       A.    The nurse remained -- she remained mute too.

21       Q.    Okay.  So, basically, what you're saying --

22   I just want to make sure I understand -- is that

23   Lieutenant Oliver and the nurse both just basically

24   complied with what Ingram said.

25       A.    Yes, sir.

1    Q.    They didn't try to step in or try to do

2  anything on your behalf.

3    A.    No, sir.  Ingram, Ingram once made a

4  statement in the past that he has more rank than any

5  white shirt at Jackson CI.  And if he told you that a

6  duck could pull a truck, you better --

7                (Stenographer requested clarification.)

8                THE WITNESS:  He once -- he once told me

9            that he has more rank than any white shirt at

10           Jackson CI, and if I tell you that a duck could

11           pull a truck, you better hook that motherfucker

12           up.

13               So, obviously, Ingram has a lot of

14           influence at Jackson CI.

15  BY MR. KVERNE:

16    Q.    Okay.  And Lieutenant Oliver will confirm

17  what you just said.

18    A.    He should.

19    Q.    That he has greater rank.

20    A.    He should.

21           No, no.  What do you mean he has greater?

22           He don't have greater rank officially.  No

23  one does.  Oliver is a lieutenant.  Grainger was a

24  sergeant at the time.

25           But as far as how many years a person could

```
 1   have at DOC or who you know at DOC, that
 2   would -- that is what would dictate your unofficial
 3   rank.  Seniority or influence overrules any kind of
 4   rank as far as the shirt is concerned.  I don't know
 5   if you get the gist of what I'm saying.
 6       Q.   So a colonel will confirm what you just
 7   said.
 8       A.   Colonel?
 9       Q.   Yes.
10       A.   I don't know why the colonel would confirm.
11   He wasn't present.
12       Q.   Right.
13            But if you're talking about seniority --
14       A.   Right.
15       Q.   -- a colonel would have a great deal of
16   seniority over a sergeant.
17       A.   No, he wouldn't.
18            MR. COOK:  I'm going to object.
19            THE WITNESS:  He would if --
20            MR. COOK:  Object to argumentative
21        questioning.
22            MR. KVERNE:  You still have to answer the
23        question, though.
24            THE WITNESS:  I said no, he wouldn't.
25   BY MR. KVERNE:
```

```
 1        Q.    He wouldn't?  A colonel would not have a
 2   greater degree of seniority over a sergeant?
 3        A.    Officially?  I'll repeat again.  I said
 4   officially, yes.
 5              Unofficially, when you're speaking of
 6   someone, if you've been working at Department of
 7   Corrections and you retired and you come back to the
 8   Department of Corrections as a officer, then, I mean,
 9   you have more seniority than the person that's been
10   working at DOC for ten years because you did your 20,
11   you retired, you came back and now you're 15 years,
12   then of course not.  I mean, you have more seniority.
13   Who's been doing it the longest.
14        Q.    How do you --
15        A.    I know where the -- basically -- basically,
16   I know where the skeletons are kept, I know all your
17   secrets, I know what's going on, you just been
18   working here ten years, you don't know squat.
19              So that's what I mean by unofficially.
20              So officially you have the job title, so
21   yes.
22              Unofficially, I have more seniority.
23        Q.    Do you think colonels are just hired as
24   colonels?
25        A.    You're speaking of the colonel.  I'm
```

1  speaking of Lieutenant Oliver and Ingram.
2      Q.   Well, you're talking about seniority and
3  length of -- length of retention by the DOC, right?
4              MR. COOK:  Object to argumentative
5          question.
6              THE WITNESS:  Right.
7              Can you please disregard what I just said?
8          Because I don't want to argue with you, sir.
9              I don't know.  I've never worked for the
10         Department of Corrections a day in my life.  I'm
11         just going off of what I see as a inmate.
12  BY MR. KVERNE:
13     Q.   Okay.  So I just want to make clear, what
14  you said earlier, you're going to take back that
15  statement.
16     A.   I don't know what I stated I'm taking back,
17  sir.  Would you please reiterate what statement?
18     Q.   You're going to take back the statement that
19  he has unofficial pull over individuals greater than,
20  basically, a lieutenant or other individuals.
21             MR. COOK:  Object to form.
22             THE WITNESS:  Yes, I guess.
23             I'm not taking back the statement, what
24         Ingram made a statement saying that he has more
25         rank than any right [sic], sir, and if it's a

```
 1              duck, it should pull the truck, hook it up.  He
 2              did say that.  That's a statement that he did
 3              make.
 4  BY MR. KVERNE:
 5     Q.   But it's your understanding that he has
 6  greater pull than any other white shirt at the
 7  institution.
 8     A.   He has greater pull --
 9              MR. COOK:  Object to form.
10              Go ahead.
11              THE WITNESS:  He has greater pull than
12              Lieutenant Oliver.  That was -- I witnessed
13              that.
14  BY MR. KVERNE:
15     Q.   How long did -- has Lieutenant Oliver worked
16  for the Department of Corrections, do you know?
17              MR. COOK:  Object to form.  Lack of
18              foundation.
19              THE WITNESS:  I have no clue.
20              I know Ingram, Ingram spoke over Oliver
21              and Oliver shut up.  He didn't put up a fight.
22  BY MR. KVERNE:
23     Q.   Okay.  So basic -- what you're saying is
24  that Lieutenant Oliver, the nurse and Ingram
25  conspired with one another to deny you medical
```

```
 1   treatment.
 2              MR. COOK:  Object to argumentative
 3         questioning.
 4              MR. TARJAN:  And calls for a lawful
 5         conclusion -- legal conclusion.
 6              MR. KVERNE:  Answer the question.
 7              THE WITNESS:  I wouldn't know how to
 8         answer that question.
 9   BY MR. KVERNE:
10      Q.   Well, they came to an agreement, right?
11      A.   I guess.
12      Q.   And that agreement was made in front of you
13   that you would not be medically assessed.
14      A.   Would remaining mute be an agreement?
15      Q.   Sure.  Inaction, yeah.
16              MR. COOK:  Object to form.  And disagree.
17              THE WITNESS:  I mean, I -- I just told you
18         they remained mute.  I'm not going to say they
19         agreed.  You don't have to agree if you remain
20         mute.  My personal feelings with them, how I
21         feel, I'm not going to voice them.  Doesn't mean
22         I agree with you.
23   BY MR. KVERNE:
24      Q.   Well, Lieutenant Oliver and the nurse,
25   neither stepped up for you.
```

```
 1              MR. COOK:  Object to argumentative
 2         questioning.  Can I have a standing objection to
 3         this line of questioning?
 4              MR. KVERNE:  Go ahead, Mr. Cook, yes.
 5         Keep going.
 6              THE WITNESS:  That wouldn't mean that I
 7         would agree.  That would be for the sake of
 8         argument that I'm going to remain mute.  I still
 9         don't agree.
10    BY MR. KVERNE:
11      Q.   But their actions dictate that they didn't
12    actually treat you.
13      A.   The nurse is the one that was supposed to be
14    treating me.  Lieutenant Oliver was not a medical
15    professional to treat me, sir.
16           If you -- if you tell me --
17      Q.   Did you instruct the nurse to treat you?
18           (Stenographer requested clarification.)
19              MR. KVERNE:  Did he.
20    BY MR. KVERNE:
21      Q.   Did he instruct the nurse to treat you?
22      A.   When I walked in, the nurse was asking me
23    questions.  No one else was talking when I first
24    walked in.  The nurse informed me that she was here
25    for a medical assessment, do I have any injuries to
```

1    report, and I told her yes.

2         When I -- I began to report my injuries,

3    Ingram stopped me in the middle of me reporting my

4    injuries and told me what I repeated earlier.

5    Q.    But -- so Ingram stepped in and said don't

6    treat your injuries and --

7    A.    I never said --

8    Q.    Go ahead.

9    A.    I never said he said don't treat his

10   injuries.  I never said he said that --

11   Q.    Okay.

12   A.    -- sir.

13   Q.    So clarify for me, what exactly did he say?

14   A.    He said:  "Wait, wait, hold up.  Before you

15   report those injuries, before you document those

16   injuries, I want to let you know what's going to

17   happen.  If you say something about them injuries,

18   you're going to be in confinement longer, I'm going

19   to hook you up, write some more DRs, and I'm going to

20   gas your ass."

21   Q.    And neither of the lieutenants nor the nurse

22   said to Mr. Ingram that was inappropriate, ignore

23   him?

24            MR. COOK:  Asked and answered.

25            MR. KVERNE:  Yes?

```
1              THE WITNESS:  No.  No, sir.
2    BY MR. KVERNE:
3         Q.   Okay.  So they just went along with
4    your -- strike it.  Never mind.  I think the point's
5    been made.
6              What injuries did you suffer?
7         A.   Back injury.  I hit my head on the concrete.
8    I had -- my shoulder was screwed up.  Had a
9    bit -- bite mark on my stomach and my rib cage,
10   around my abdomen area.  I had several abrasions and
11   lacerations.
12        Q.   So your back, what treatment did you receive
13   for your back?
14        A.   After I was seen by medical?
15        Q.   At any point.
16        A.   At any point since when, sir?
17        Q.   Since -- since the date of the incident.
18        A.   Yes, my lower back around my tailbone area.
19        Q.   Okay.  What treatment did you receive?
20        A.   Oh.  You said what treatment did I receive?
21        Q.   Yes.
22        A.   I received Naproxen.  First it was
23   ibuprofen, anesthesia form, Naproxen.  And the
24   Naproxen, they -- they put on -- several x-rays was
25   conducted.  I was just given a pain [sic] for pain, a
```

1  muscle relaxant that was through a single dose.  I

2  don't know the name of it.  It was very strong.  As

3  far as medication, just treatment.

4      Q.    Okay.  And those x-rays you mentioned, they

5  came back negative?

6      A.    I never did a follow-up, sir.

7      Q.    Okay.

8      A.    Medical doesn't follow up.

9      Q.    So assuming that because you never did a

10  follow-up, they came back negative.

11      A.    I can't assume that, sir.  Sometimes medical

12  just lazy.

13      Q.    Okay.  Your ribs, you mentioned your ribs.

14  What injuries did you suffer to your ribs?

15      A.    I didn't say my ribs.  I said my rib cage

16  area, my abdomen where he bit me at.

17      Q.    Okay, so he bit you.

18      A.    Yes.

19      Q.    Where did he bite you?

20      A.    In my abdomen, around my rib cage area.

21      Q.    Where specifically?

22          Your abdomen is a big area.  So where

23  specifically in your abdomen?  Your left side?  Your

24  right side?  Your stomach area?  Your back?

25          Go ahead.

1     A.    The right side of my rib cage area, sir.

2     Q.    Okay.  Down to your waist?

3     A.    My rib cage does not reach to my waist, sir.

4     Q.    I know it does not reach to your waist, but

5  I'm saying, it was -- so it was directly on your ribs

6  on your right side?

7     A.    My rib cage area, sir, on the right side,

8  sir.  Abdomen area, sir, right up under my breast or

9  right up under my pectoral or --

10    Q.    So, okay.  So on the front --

11    A.    Would you want me to stand up and show you,

12  sir?

13    Q.    Sure, sure, that would be helpful, yes.

14    A.    So right up here.  With the handcuffs, sir,

15  I can't get the chains up.  It was right here.

16    Q.    Okay.  All right.  So on the front part.

17  Basically, like the front part of your chest area,

18  under your pectoral muscle --

19    A.    Yes.

20    Q.    -- is what you're saying.

21    A.    Rib cage area, abdomen.

22    Q.    Okay.  All right.

23          And what treatment did you receive for that?

24    A.    Nothing.  Nothing.

25    Q.    Okay.  Didn't become infected?

1      A.    No, sir.

2      Q.    Okay.  What other injuries did you suffer?

3            You said you hit your head, right?

4      A.    Yes, sir.

5      Q.    All right.  What -- what treatment did you

6   receive for hitting your head?

7      A.    All of that came with ibuprofen, sir.  All

8   the same treatment was basically pain medication.

9      Q.    Okay.

10     A.    Right until now, I'm still taking pain

11   medications.

12     Q.    And you said abrasions, right?

13     A.    Yes, sir.

14     Q.    What abrasions did you suffer?

15     A.    Had bruises on my left and right shoulders

16   from the -- from the steel bunk, from the concrete.

17   Had -- what you call it? -- hickeys on my head.

18   Several hickeys on my head.

19           And my knees had abrasions on them, like

20   bruises and stuff like that.

21     Q.    And what treatment did you receive for that?

22     A.    Same thing, medication.

23     Q.    Okay.  Any other injury that we didn't go

24   over?

25     A.    Any other injury?

1    Q.    Yeah.

2    A.    No, sir.

3    Q.    Okay.

4              THE COURT REPORTER:  Can we take a

5         five-minute break?

6              MR. KVERNE:  Of course.

7              (Thereupon, a brief recess was taken.)

8              MR. KVERNE:  Okay.

9  BY MR. KVERNE:

10    Q.    So we were talking about -- we just finished

11  talking about your injuries.

12              After you were medically assessed,

13  Mr. Wilson, where were you taken?

14    A.    That's not right.

15    Q.    I'm sorry, what?  What's not right?

16    A.    I think you -- I think you're -- because you

17  asked me about a sick call and what treatment I

18  received for my injuries, and that wasn't in

19  confinement.  I think you're mixing the two, sir.

20    Q.    Okay.  So let's go back to November 8th

21  then.

22    A.    Right.

23    Q.    I just asked you about your injuries, but

24  let's go back to November 8th.

25    A.    Okay.

1    Q.    So after the nurses -- after the nurse did

2    not fully document your injuries on that date --

3    right?

4          Where were you taken after that?

5    A.    I was taken back to my cell, H1-208.

6    Q.    By who?

7    A.    I can't remember who.  I can't remember the

8    exact officer who escorted me back.

9    Q.    It wasn't Causey or Ingram that you

10   remember?

11   A.    I can't -- I'm -- that right there, I can't.

12   I'm drawing a blank right there, sir, for now.

13   Q.    Okay.  You were taken back to your cell,

14   though.  Do you remember any communications you had

15   with that officer, whoever it may be?

16   A.    If I could remember that, I could remember

17   who took me back, sir.  I cannot remember exactly who

18   took me back.  I'm drawing a complete blank on that

19   trip back to my cell.  I cannot picture or remember

20   exactly who it was.  Sorry about that.

21   Q.    Okay.  So then you get back to your cell,

22   right?

23          Handcuffs are removed?

24   A.    Yes, sir.

25   Q.    Okay.  And then no other issues really

1    with -- related to Mr. Veillard or anything since?

2        A.    No, sir.  I have not -- I mean, in between

3    what time?

4        Q.    What do you mean, "in between what time"?

5    I'm sorry.

6        A.    I mean, are you talking --

7        Q.    Have you ever had any other interactions

8    with Mr. Veillard since November 8, 2022?

9        A.    Of course.  I mean, that has nothing to do

10   with this case, but yes.

11       Q.    What interactions have you had with him?

12       A.    May, in May 2023, I was in G4 dormitory.

13   And Veillard was released from confinement or came

14   from somewhere and he moved into G4-212 or 213 or

15   something like that.  He moved into the same quad as

16   me, the same wing.

17            And I would think then that we would keep

18   separate.  I would assume that we would keep separate

19   then, as he had made a PREA allegation.  I would

20   assume that we supposed to keep separate, and they

21   moved us into the wing.

22            And he started -- that's when he had a

23   chance to inform my gang brothers that I sexually

24   assaulted him, I was a homosexual, which they're a

25   homosexual and a gang member.  The only punishment is

1  death, so.

2       And that was right around the time that

3  Grainger came into the wing and made a statement that

4  I was a snitch.  He informed the population that I

5  was a snitch.

6     Q.   So that statement that you made earlier

7  where we talked about, it was a couple months after

8  the second medical assessment, that was -- you're

9  talking about Grainger, Grainger and -- and what

10 you're talking about with Veillard now happened

11 around the same time?

12    A.   No.  That happened -- that happened later

13 on.

14    Q.   It happened later on?

15    A.   Yes.  This is May I'm speaking on now, May

16 of 2023 I'm speaking on now.

17    Q.   Okay.  All right.

18       So -- but the two of you were in the same

19 wing?

20    A.   They placed him in the same wing as me in

21 May 2023.

22    Q.   Okay.  But you were not in the same cell at

23 that point.

24    A.   Not the same cell.  We weren't in

25 confinement.  We weren't in confinement.  This was

 1   general pop.
 2       Q.   How long did the two of you remain in that
 3   wing together?
 4       A.   The one in May?
 5       Q.   Yeah.
 6       A.   Not precise.  I was stabbed.  I was stabbed
 7   probably two weeks after.
 8       Q.   Stabbed two weeks after.
 9       A.   Yeah.
10       Q.   Stabbed by who?
11       A.   The same person I told you about, the gang
12   organization, the G's.
13       Q.   Oh, the Gangster Disciples.
14       A.   Right.
15       Q.   Okay.  All right.
16            Okay.  Any other interactions with
17   Mr. Veillard?
18       A.   After that, no, sir.
19            I mean yeah, after that, there was an August
20   15 date where him and another guy jumped me inside
21   the cell.  That was August 15, that was August -- not
22   August 15th.  That was August 10th.  That was August
23   5th, 2023.
24       Q.   August 5th, 2023?
25       A.   Yes.  If I'm not mistaken, it was

1    August 5th, 2023.

2        Q.    Okay.  And you said they jumped you inside

3    the cell?

4        A.    Yes.

5        Q.    Were any of the officers that we've talked

6    about, any of the defendants that I did, were they in

7    any way involved in that?

8        A.    No, sir.  No, sir.

9        Q.    All right.  Anything else with Mr. Veillard?

10       A.    That was it.

11       Q.    Okay.  The medical assessment that you

12   talked about where you got medically assessed, that

13   was on November 13th, right?

14       A.    I can't remember the exact date that was.  I

15   don't think it was the 13th.

16       Q.    Didn't you say it was the same day that

17   Ms. Jones had talked with you and escorted you to the

18   medical based on the sick call?

19       A.    No.

20       Q.    It wasn't that day?

21       A.    No, sir.  No, I never said that, sir.

22       Q.    When did the -- when did the escort with

23   Ms. Jones occur?

24       A.    That occurred on the 13th, but I

25   wasn't -- that wasn't for a medical assessment, sir.

1    Q.    All right.  What was that for then?

2    A.    Prior to you going to confinement, prior to

3  your placement in confinement, you have to go to

4  medical to have a medical -- it's called a

5  pre-confinement evaluation, sir.

6    Q.    Okay.

7    A.    And that's just for confinement purposes.

8    Q.    And during that, you were medically

9  assessed, though, right?

10    A.    Yes, sir.

11    Q.    Did you tell any of the nurses about your

12  injuries you had suffered on the 8th?

13    A.    Can't recall.  I think I refused.  I'm not

14  sure.  I'm not sure.

15        Because the only thing for that, they check

16  your vitals, find out your bunk, find out your diet,

17  and that's it really.  They really don't care about

18  nothing else.

19    Q.    Okay.  But you didn't make any complaints to

20  any of the nurses or officers during that about any

21  of the injuries you suffered on the 8th.

22    A.    I couldn't.  I was with Jones.  Jones was

23  present, and I was told she already told me what I

24  was going to confinement for, there was no need to

25  make my situation worse, at that moment right in

1    front of her.

2        Q.    Okay.  Were you medically assessed for your

3    injuries?

4        A.    Excuse me?

5        Q.    Were you eventually medically assessed for

6    your injuries?

7        A.    Eventually, yes, I was treated and medically

8    assessed for them.

9        Q.    When?

10        A.    I don't know the exact date.  I'm pretty

11    sure they're in my medical file.  I can't remember

12    the exact date.

13        Q.    Is it before or after the thing with Jones?

14        A.    I can't remember.

15        Q.    Okay.  All right.  Give me one moment.

16        A.    Yes, sir.

17        Q.    All right.  Couple more questions.

18             Prior to Mr. Cook and Mr. Tarjan coming on

19    to the case, you filed complaints, right?

20        A.    Prior to Mr. Cook and Mr. Tarjan coming on

21    to the case?

22        Q.    You filed complaints in this case.

23        A.    Yes, sir.

24        Q.    An original complaint and I think an amended

25    complaint, right?

```
 1      A.   Yes, sir.

 2      Q.   Okay.  And in neither of those complaints

 3   you sue Mr. Veillard for the attack on your person.

 4      A.   I don't recall.

 5      Q.   Okay.  Did you ever attempt to sue

 6   Mr. Veillard for attacking you?

 7      A.   I don't recall, sir.

 8      Q.   Okay.  So would looking at your complaints

 9   refresh your memory on that?

10      A.   Yes, sir.

11      Q.   Okay.  Give me one moment.

12      A.   Yes, sir.

13           MR. COOK:  Mr. Kverne, we've been through

14      this before.  I'm going to make an objection if

15      you ask for legal conclusions.

16           MR. KVERNE:  Your objection is noted.

17   BY MR. KVERNE:

18      Q.   Okay.  Do you see my screen, Mr. Wilson?

19      A.   Yes.

20      Q.   This is your original complaint, right?

21      A.   Yes, sir.

22      Q.   Okay.  And the defendants that you sued are

23   listed starting on page 2 -- or 3 here, right?

24      A.   No, sir.

25      Q.   They're not?
```

1    A.    The defendant that I sued started on page 1,
2    sir.
3    Q.    Okay.  So you're saying these individuals?
4    A.    Yes, sir.  Plus the ones at the bottom.
5    Q.    Plus Glenn Hancock and Nurse Jane Doe,
6    right?
7    A.    That's where it says "page 2 of 2"?
8    Q.    Ok?
9    A.    That's -- I think you said.
10    Q.    All right.  So these are the individuals
11    that you sued.
12          All right.  Is Mr. Veillard listed as an
13    individual that you sued?
14    A.    I'm seeing Ingram, Grainger, Jones, King,
15    Causey, White, Studemire, Pearson, Hancock and Nurse
16    Jane Doe.  I don't see --
17              (Stenographer requested clarification.)
18              THE WITNESS:  After Pearson, there's
19          Hancock and Nurse Jane Doe.  I don't see a
20          Veillard, sir.
21    BY MR. KVERNE:
22    Q.    So you didn't sue in the original complaint
23    the attacker in the original complaint, correct?
24    A.    I answered that already, sir.  No, sir.
25    Q.    Okay.  All right.

```
 1            This is your amended complaint, correct?
 2       Yes?
 3   A.    I presume, sir.
 4   Q.    Okay.  And the defendants that you've sued
 5  are right here, right?
 6   A.    Yes, sir.
 7   Q.    Okay.  Did you sue Mr. Veillard in that
 8  complaint either?
 9   A.    I can't recall, sir.  I mean, if you showed
10  me the body that was added on.  If there's no
11  add-ons, then, no, sir.
12   Q.    It does not look like there's any add-ons.
13   A.    No, sir.
14   Q.    It actually looks like the defendants listed
15  are Ingram, Grainger, Causey, Jones and Studemire.
16   A.    I don't see a Veillard, sir.
17   Q.    Okay.  So Veillard was not sued in that
18  complaint either.  Why have you not sued
19  Mr. Veillard?
20            MR. COOK:  Okay.  This is my objection.
21        This is my objection.  I hardly object to your
22        asking him for legal conclusions.  He has
23        lawyers who work for him who draw up his
24        complaint, and I think it's very unfair for you
25        to question him about legal matters.
```

```
1              MR. KVERNE:  Your objection is noted.
2              Why have you not sued Mr. Veillard?
3              THE WITNESS:  I didn't know I could.  I
4       would if I -- if I knew I could, I would, trust
5       me.  I didn't know you could sue another inmate.
6  BY MR. KVERNE:
7    Q.   Okay.  You may want to talk with your
8  attorneys about that because you can sue another
9  inmate.
10   A.   I mean, you ask my attorneys why they didn't
11 sue him.
12   Q.   Well, I'm asking you, because in your --
13   A.   I'm not trying to be a smart-ass or
14 anything, but I mean, their names is on the amended
15 complaint.  They're the ones that filed the amended
16 complaint that officially got granted by courts.  I
17 would ask them.  I didn't know I could sue an inmate.
18 If I knew that, I would have sued a lot of inmates
19 from the past, sir.
20   Q.   Okay.  Have you ever heard of -- you've
21 heard of assault and battery before, right?
22   A.   Yes, sir.
23   Q.   Okay.  And, basically, an assault is you're
24 in fear of being attacked, right?
25   A.   An assault is not you being in fear of being
```

```
 1   attacked.  It's someone --
 2              (Stenographer requested clarification.)
 3              THE WITNESS:  An assault is not a -- an
 4         assault is not a fear of you being attacked.  An
 5         assault is you actually being verbally attacked
 6         or attacked.
 7   BY MR. KVERNE:
 8     Q.   Okay.  And Mr. Veillard did that to you.
 9     A.   Correct.
10     Q.   And then he actually hit you, correct?
11     A.   Correct.
12     Q.   And you did not want to be hit by
13   Mr. Veillard.
14     A.   Any more?
15     Q.   At any point.
16     A.   I don't want to be hit by nobody.
17     Q.   Okay.
18     A.   So you telling me that I could sue inmates?
19     Q.   Absolutely, you can.
20     A.   All right.  How would I do that, sir?
21     Q.   You should talk with your attorneys about
22   that.  They're the ones that represent you in this
23   case.
24     A.   I mean, you informed me, you enlightened me,
25   so I'll get back on that.
```

1                And I apologize, sir.

2        Q.   Yep.  Okay.  And it appeared, based on the

3    original -- one of -- the original version of your

4    complaint -- both versions of your complaint, you

5    attempted to sue the nurse, correct?

6        A.   Yes, sir.

7        Q.   Okay.  And the theory for suing, that was

8    that she did not medically assess you.

9                MR. COOK:  Same objection.  Calls for a

10          legal conclusion.

11                THE WITNESS:  Yes, sir.

12   BY MR. KVERNE:

13       Q.   Okay.  Do you know if -- do you know if

14   you're suing the nurse now?

15       A.   I don't think.  I don't see her name.  The

16   reason why I didn't do it on the last one because I

17   didn't know her name.

18                And the instructions on the 1983 states you

19   must state the name of the individual that you're

20   suing.  So then I didn't know her name, I didn't know

21   if Nurse Jane Doe would fly or not, so I --

22       Q.   Is it your intent to sue the nurse?

23       A.   My intent --

24                MR. COOK:  Object.

25       A.   -- was to sue the people that I sued, sir.

1          MR. COOK:  Go ahead.

2          THE WITNESS:  My intent was to sue the

3      people that I sued who are responsible for me

4      getting beat up, sir.

5  BY MR. KVERNE:

6      Q.   Okay.  You have attorneys now, correct?

7      A.   Yes, sir.

8      Q.   And they should be able to find out the

9  nurse's name?

10      A.   I wouldn't know what they're able to do,

11  sir.  If you could ask them.  I apologize for

12  sounding like a smart-ass.  But you could ask them.

13  They're present.

14          MR. COOK:  Okay.  You can't ask us.

15          (Stenographer requested clarification.)

16          MR. COOK:  I interjected that he can't ask

17      us.

18  BY MR. KVERNE:

19      Q.   All right.  Give me one moment, if you

20  would.

21      A.   Yes, sir.

22      Q.   Is there anything else that we've talked

23  about today that you'd like to add that we haven't

24  already talked about?

25      A.   Everything I added was in the complaint,

1  sir.

2      Q.   Okay.  Do you know of any witnesses that you

3  believe would be helpful to your case?

4      A.   I'm confused now.  I apologize.  I'm -- I'm

5  totally confused.  I'm dumbfounded right now.

6          I thought -- I was under the impression that

7  I speak about things like this with my attorneys in

8  private.  I didn't know that I was supposed to tell

9  you if any --

10     Q.   I'm just asking you, do you know of any

11  witnesses that you've spoken with that may be helpful

12  to your case, sir, maybe would be useful in talking

13  about this case?

14              MR. COOK:  I'm going to --

15              THE WITNESS:  Would I discuss that with

16          you without talking to my attorney first?

17              MR. KVERNE:  Go ahead, Mr. Cook.

18              MR. COOK:  Yeah.  I'm just going to object

19          to any legal conclusions and also instruct my

20          client not to answer anything that is based on

21          conversations that we've had.

22              MR. KVERNE:  Yes.  Do not tell me any

23          conversations that you've had with Mr. Cook.

24  BY MR. KVERNE:

25     Q.   But are you aware of any names of any

1  individuals that you've spoken with, other than,

2  obviously, Mr. Cook or Mr. Tarjan, obviously you've

3  spoken with them, but any names of any individual

4  witnesses that were present during these events that

5  would be useful to your case?

6              MR. COOK:  Same objection.

7              THE WITNESS:  Not that I'm aware of at

8         this time.  Maybe if I had time to think.  I

9         mean, you got me up under extreme stress right

10        now, sir, but I may come up with something, but

11        at this time, no, sir.

12  BY MR. KVERNE:

13     Q.   Have you talked -- you said you talked with

14  or you were eventually placed with some of your

15  fellow gang members at some point, right?

16     A.   Yes, sir.

17     Q.   Okay.  Did you ever talk to them about this

18  incident with Mr. Veillard?

19     A.   This incident?

20     Q.   Yes.

21     A.   This incident, this incident was spoken

22  about with Veillard and them and I had nothing to do

23  with --

24              (Stenographer requested clarification.)

25              THE WITNESS:  This incident was spoken

1              about with Veillard and other gang members, but

2              I had no part in it.

3                   They wanted -- they wanted Veillard to

4              verify whether or not I sexually assaulted him

5              or not.  And whatever they talked about, a

6              decision was made and a hit was placed on my

7              life.

8    BY MR. KVERNE:

9         Q.   Okay.

10        A.   I guess -- I guess I was X'd out and a hit

11   had been placed on my life, and a hit was carried out

12   on my life due to Veillard's mainly a homosexual and

13   Grainger labeling me a snitch.

14        Q.   But you did -- you did eventually -- did you

15   at any point talk with any of your fellow gang

16   members about this incident?

17        A.   No, sir.  Not that I recall at this moment.

18        Q.   Okay.  Did you talk with any of Veillard's

19   gang members about this incident or anyone associated

20   with him?

21        A.   Not that I can think of right now, not off

22   the top of my head, sir.

23        Q.   Okay.

24              MR. KVERNE:  I have no further questions.

25              Go ahead, Mr. Cook.

```
 1              MR. COOK:  All right.  Thank you.
 2                      CROSS-EXAMINATION
 3   BY MR. COOK:
 4       Q.   Yeah.  Mr. Wilson, I'm going to take the
 5   last matter first.
 6            Do you have any idea what Mr. Veillard's
 7   financial assets are?
 8       A.   No, sir.
 9       Q.   Do you have any idea what Mr. Veillard has
10   that he could pay a judgment if you should get one
11   against him?
12       A.   No, sir.
13       Q.   Okay.  Do you have any idea of any basis on
14   which you could file a civil rights suit against
15   Mr. Veillard?
16       A.   No, sir.
17       Q.   Do you have any belief that, or do you have
18   any basis for believing that the State would pay
19   damages if you got them against an individual
20   prisoner like Mr. Veillard?
21       A.   Logically?  No.  Why would the State, why
22   would the State pay rewards for another inmate on
23   another inmate?
24       Q.   That's what I was asking you.
25       A.   Yeah.  I don't believe -- I don't believe
```

1  that, sir.

2     Q.   Do you have any reason to believe that you

3  should sue people for whom you can't get any money,

4  whose litigation would just cost you money in the

5  course of the suit?

6     A.   I wouldn't, no, sir.  I don't see no other

7  reason for that.

8     Q.   Okay.  Is there any reason that you would

9  not discuss a matter like that with your attorneys

10  before doing it?

11     A.   No, sir.

12     Q.   Okay.  Now I'm going to go back to the

13  beginning.

14          You talked about all kinds of slurs and

15  threats and hostile comments.  And to the extent that

16  each of these three officers made those kind of

17  comments and including Jones, did you understand that

18  the basis of those threats and slurs were hatred of

19  inmates who filed grievances and lawsuits?

20     A.   Yes, sir.

21               MR. KVERNE:  Objection, leading.

22               MR. COOK:  Okay.

23  BY MR. COOK:

24     Q.   Do you -- do you have any basis for thinking

25  that the purpose of those threats and slurs was to

 1  shut your mouth?

 2          MR. KVERNE:  Objection, leading.

 3          THE WITNESS:  What I gathered from them

 4      threats and statements were not only hate,

 5      hatred for people that write grievances, they

 6      call us writ -- they refer to us who write, writ

 7      writers.  And there is a bit distaste or dislike

 8      for individuals amongst officers and inmates.

 9      Yes, I'm very aware of that.

10  BY MR. COOK:

11      Q.    So that when they say to inmates that you're

12  a snitch or a rat, does that create a danger for you?

13      A.    Sir, what -- when they refer to you as a rat

14  or a snitch, it's in hopes or it's an attempt to get

15  other inmates to retaliate on me.  It's, basically,

16  get other inmates to do their dirty work.  Because

17  once they label you a rat or a snitch, other inmates

18  detest that in prison because they've been ratted on

19  or snitched on, so basically your life is up for

20  grabs from that point on.

21      Q.    Does that place you in fear?

22      A.    Yes, sir.

23      Q.    Okay.  And I think you did say that you had

24  a hit carried out on you based on the allegation that

25  you were a rat or a snitch.

```
 1       A.    Yes, sir.

 2       Q.    And when they say "snitch," do you

 3   understand the officers mean that you informed their

 4   superiors through the grievance process?

 5       A.    Yes, sir.  They refer to that as snitching,

 6   sir.

 7       Q.    And that's the same thing as a writ writer.

 8   Is that --

 9       A.    Yes, sir.

10       Q.    -- true?

11       A.    Yes, sir.

12       Q.    Now, Mr. Kverne frequently used the word

13   "fight."

14       A.    Yes, sir.

15       Q.    And -- and when, in responding to, you also

16   used the word "fight."  Did you mean to say that

17   your --

18              MR. KVERNE:  Objection, leading.

19              THE WITNESS:  Before you finish that, the

20         reason why -- I tried to correct him a couple

21         times, when you just said that.  And actually,

22         he did say it.  And I would reiterate and say,

23         after the attack it turned into a fight due

24         to -- I mean, once I defend myself, of course,

25         it's going to be a fight, but it's me defending
```

```
 1          myself.
 2     BY MR. COOK:
 3          Q.    But is it a fight in the voluntary sense --
 4          A.    No.
 5          Q.    -- that you're doing it because you want to?
 6          A.    No, sir, it's not because I want to.
 7          Q.    Okay.  So when you said fight, what you
 8     meant was self-defense?
 9          A.    Correct, sir.
10          Q.    Okay.  What did you consider the officer --
11     I guess, was it Sergeant Causey?
12          A.    Officer Causey.
13          Q.    Officer Causey said, You got what you were
14     looking for.  Was that a hostile comment?
15          A.    Yeah, I took it as that.
16          Q.    Okay.
17          A.    Prior to the threats that were made and the
18     incident and then him saying that, it was like
19     a -- more like a -- yeah.  It was a snide remark.
20          Q.    Right.
21                Do you have any idea who set all that up for
22     you to be placed in a cell with this guy?
23          A.    No, sir.
24          Q.    Who did you say was the alpha?
25          A.    Ingram.
```

```
 1        Q.    Ingram.   Okay.

 2              And Ingram was pretty much at the cell front

 3    while Causey came and went?

 4        A.    Yes, sir.

 5        Q.    And --

 6        A.    The entire -- him and Grainger was -- him

 7    and Grainger were there the entire time while Causey

 8    came and went.

 9        Q.    Okay.   And when Causey came and went, he'd

10    usually drop another threatening, hostile or --

11        A.    Or derogatory remark?

12        Q.    Yeah.

13        A.    Yes, sir.

14        Q.    When you were brought in to the nurse and

15    the nurse asked you if you had any injuries, and I

16    guess Ingram made that little speech about if you

17    want to document your injuries, you're going to be in

18    confinement longer and I'm going to gas you, and what

19    else did he say he was going to do?

20              MR. KVERNE:  Objection, misstating his

21         testimony.

22              THE WITNESS:  No.  That's what I said.  I

23         said that earlier, Mr. Kverne, when you asked me

24         that earlier.  Sorry about that.

25              But yeah, he said you doc -- I'm telling
```

```
 1              you now, if you document these injuries, this is
 2              what's going to happen.  You're going to stay in
 3              confinement longer, I'm going to hook you up,
 4              mess with you all, I'm going to gas your ass,
 5              and you're going to stay in here longer.
 6                   MR. KVERNE:  Objection withdrawn.
 7    BY MR. COOK:
 8         Q.   When you say "hook you up," what did you
 9    understand that to mean?
10         A.   They got a terminology called "hook you up,"
11    meaning just -- basically it makes you stay in
12    confinement forever.  They're going to write you
13    false DRs or lie on you or --
14                   (Stenographer requested clarification.)
15                   THE WITNESS:  DRs, disciplinary reports.
16    BY MR. COOK:
17         Q.   Does that ever include planting knives and
18    contraband?
19                   MR. KVERNE:  Objection.
20                   THE WITNESS:  Yes.
21                   MR. KVERNE:  Leading.  Speculation.
22    BY MR. COOK:
23         Q.   After you went in there and the nurse asked
24    you if you had injuries and Ingram made that speech,
25    you said that Oliver attempted to say something but
```

 1    basically deferred to Ingram?

 2        A.    Correct.

 3        Q.    And then did you testify that the nurse said

 4    that she was done?

 5        A.    Yes, she did.

 6        Q.    Did she take your vitals?

 7        A.    No, sir.

 8        Q.    Didn't take your temperature or your blood

 9    pressure, your pulse?

10        A.    She didn't even tell me to step on the

11    scale, sir.

12        Q.    Basically like it never happened?

13        A.    Correct.

14        Q.    Do you know of any paperwork that came out

15    of that episode?

16        A.    No, sir.  The only thing -- the only

17    paperwork she had with her was a diagram.  That was

18    it.  No medical chart.  Nothing.

19                THE COURT REPORTER:  A diagram?

20                THE WITNESS:  I think that's the name of

21         it.

22    BY MR. KVERNE:

23        Q.    A chart showing a body?

24        A.    That's it.

25        Q.    Okay.  And so, although you were supposed to

1    get an exam on that date, would there be anything in

2    the records showing that you did, that you know of?

3        A.    From my standpoint as a inmate, I'm assuming

4    that it should be.

5        Q.    Okay.  There should be an exam record, but

6    you're saying no exam took place.

7        A.    Correct.

8        Q.    Okay.

9        A.    I wouldn't -- I wouldn't know if that was

10   because she needed an exam, but, if that's considered

11   an exam, then...

12       Q.    Well, you did have injuries, right?

13       A.    Right.

14       Q.    Now, you told Mr. Kverne that you had

15   abrasions and lacerations --

16       A.    Yes, sir.

17       Q.    -- is that correct?

18       A.    Yes, sir.

19       Q.    And so he repeated back to you, you had

20   abrasions, but he didn't repeat lacerations.  Did you

21   mean to leave that out?

22       A.    No, sir.

23       Q.    Okay.  Okay.

24            MR. COOK:  I have no other questions.

25                REDIRECT EXAMINATION

```
 1   BY MR. KVERNE:
 2       Q.   Let's return to financial status of
 3   Mr. Veillard.  If Mr. Veillard had a million dollars,
 4   would you sue him?
 5       A.   If he had a million dollars and he had to
 6   pay me for harming me?
 7       Q.   Yes.
 8       A.   If he had to pay me for harming me, of
 9   course I would sue him.
10       Q.   Okay.  So you would at a minimum want to
11   investigate whether or not he had a million dollars
12   that he can pay for -- pay --
13              MR. COOK:  Object to the form.  Same kind
14         of legal conclusions.
15              MR. KVERNE:  Is that correct?
16              THE WITNESS:  Go ahead, sir, repeat your
17         question, please.
18   BY MR. KVERNE:
19       Q.   You would at least want to investigate
20   whether or not he had a million dollars that he could
21   pay you.
22       A.   I would not investigate whether he did if I
23   didn't know if I could sue him or not, sir.
24       Q.   But if you could sue him, that's something
25   you'd definitely want to be interested in.
```

1      A.    Now we're talking hypothetical.  I mean, if

2   I knew I could sue him, I wouldn't even know how to

3   go about researching his financial status.  How would

4   I do that?

5      Q.    Well, you have two attorneys now, right?

6   That both represent you.

7      A.    I mean, now I do.  Of course.  Now I do.

8            But you're asking me something from a

9   layman's standpoint.  If I would have known.  That's

10  the past tense, sir.

11           Now that I have attorneys, I mean, I don't

12  really have anything to do with the legal process

13  anymore.

14     Q.    Do you want to sue Mr. Veillard if he has a

15  million dollars?

16     A.    If he has a million dollars, would I want to

17  sue him?  I don't want to answer that question, but

18  yeah, for now.

19     Q.    Okay.  This is why we're -- it's not just --

20  you're not suing the officers just for money, though,

21  right?

22     A.    No, sir.

23     Q.    It's because they -- they wronged you.

24     A.    I mean, they wronged people.

25  Their -- their -- their -- their -- their practice,

1    the way they conduct their duties is wrong.

2        Q.    And part of the recognition of this

3    particular lawsuit is basically getting people to

4    acknowledge that you have been wronged.

5        A.    Yeah.  I've been wronged and many other

6    people have been wronged.

7        Q.    Okay.  So even if Mr. Veillard didn't have a

8    million dollars and you could sue him, you'd want

9    that recognition that Mr. Veillard wronged you.

10                MR. COOK:  Object to form.  Calls for a

11            legal conclusion.

12                THE WITNESS:  I mean, I wouldn't see the

13            point.  I understand -- I think I understand

14            what you're saying.  You're basically asking me

15            would I go at Mr. Veillard in a punitive

16            standpoint.  And if that's correct in my

17            assumptions, then I wouldn't see the point of

18            going against a criminal -- going after a

19            criminal for punitive damages when they're not

20            learning a lesson when they already in prison.

21                What's the purpose?

22                A lawsuit is not going to make him change

23            his actions.  He just wants to, like he got away

24            with something and he's going to keep doing it.

25    BY MR. KVERNE:

 1       Q.    But doesn't it give you the recognition that
 2   you were wronged?
 3       A.    By whom?
 4       Q.    By Mr. Veillard.
 5             He stabbed you and attacked you -- or didn't
 6   stab you.  He attacked you, right?
 7       A.    Sir, I've been in prison approximately
 8   18 years now.  And in 18 years I've been stabbed
 9   probably eight to ten times.
10       Q.    Okay.
11       A.    I've been assaulted probably twice as many
12   times as that.
13       Q.    Okay.
14       A.    So recognition for being attacked or stabbed
15   is not going to stop by suing an inmate who is not
16   going to pay anything.
17       Q.    Wouldn't that send a message to FDC, though,
18   that they should keep you separated definitely if you
19   got a --
20       A.    I would presume they would have did that
21   when he alleged PREA.
22             (Stenographer requested clarification.)
23             THE WITNESS:  When he made the PREA
24         allegation, I would assume that at that time we
25         would be keep separate or special review

1    indefinitely, being that after I filed the

2    grievance, after I -- after I pursued the

3    grievance process and my grievance was approved

4    and it was investigated by the Inspector

5    General, me and Veillard still wasn't keep

6    separate.

7         Six months later they take him back in the

8    same room with me in general population.

9         So I feel this is a custom that DOC has

10   picked up.  So I mean, you're asking me would my

11   grievances stop an inmate.  More or less, it

12   wouldn't even stop DOC from doing what they're

13   doing, sir.

14        MR. COOK:  Mr. Kverne, let me interject

15   this.  Don't you think that it's in civil

16   conduct to try to turn a client against his

17   attorneys on basically false premises?

18        MR. KVERNE:  No.  Because this is going to

19   be part of my argument if this case goes to

20   trial, that you should be suing them as well.

21        MR. COOK:  How does he help you make your

22   argument?

23        MR. KVERNE:  The decision not to sue them

24   and not to sue the actual attacker says a lot.

25   Speaks volumes that you're just seeking money

1           and you're trying to -- you're trying to take

2           advantage of the fact that he was injured just

3           to get money from the situation and using his

4           injuries to your benefit.  Specifically, his own

5           benefit.

6                MR. COOK:  Okay.  We'll have a motion in

7           limine on that.

8                MR. KVERNE:  Go right ahead.

9    BY MR. KVERNE:

10       Q.   So, anyways, the -- getting back to your

11   specific thing.  If you could sue Mr. Veillard and

12   you had the ability to recover money from him, you'd

13   be fine with it.

14       A.   Is that a separate question from the

15   original question?  Because that wasn't the original

16   question.

17       Q.   It's the question I'm asking you right now.

18       A.   Repeat, please.

19       Q.   If -- if you could recover money from

20   Mr. Veillard, you're fine with it.

21       A.   That's it?

22       Q.   Yes.

23       A.   My main thing is having to keep separate

24   between me and Mr. Veillard.  A special review where

25   we never encounter one another again.

1    Q.    But, okay.  So it doesn't answer my
2    question, though.
3          If Mr. Veillard has a million dollars,
4    you're fine with suing Mr. Veillard for that million
5    dollars because you want the million dollars.
6    A.    Would I sue Mr. Veillard for a million
7    dollars when we still had to be housed around each
8    other?  Of course not.
9    Q.    Okay.
10   A.    At the end of the day, my safety, my safety,
11   my freedom and my well-being is more important than
12   money.  I can't spend money if I'm a quadriplegic.
13   Q.    You can't spend the money if you're a
14   quadriplegic, is that what you said?
15   A.    Yes, sir.
16   Q.    Okay.
17   A.    So if I sue him and I get $990,000 out of a
18   million that he has, but we're still housed around
19   each other, and he end up killing me this time or
20   paralyzing me this time, then what's the purpose of
21   the $990,000, sir?
22   Q.    So if -- but wouldn't a jury verdict in your
23   favor, wouldn't that send a message to FDC that
24   definitely you should not be housed together?
25   A.    How would it -- how would a --

```
1              MR. COOK:  Object to form and lack of

2         foundation.

3              THE WITNESS:  How would a

4         jury return -- how would a jury verdict return

5         of a certain amount of money change DOC's policy

6         when it's regarding an inmate on inmate?

7  BY MR. KVERNE:

8    Q.   Well, you've got a court order, so he could

9  basically get a court judgement saying that they

10 shouldn't be housed together, so isn't FDC definitely

11 on notice at that point?

12             MR. COOK:  Object to form.  Lack of

13        foundation.

14             THE WITNESS:  I would -- I would think

15        that's an injunction, sir.

16 BY MR. KVERNE:

17   Q.   So you wouldn't -- if you get a judgment in

18 a case, after a civil case for these particular claim

19 and you went and talked with and then you filed a

20 case against FDC because you were still being housed

21 against Mr. Veillard, you don't think that that would

22 play in any way, be important?

23             MR. COOK:  Objection, foundation.

24        Argumentative.

25             THE WITNESS:  I wouldn't -- I wouldn't
```

```
 1              know, sir.  I never made it that far in lawsuits
 2              for me to know that judgments and the pass-downs
 3              and rewards, I wouldn't know nothing like that
 4              for me to answer that question truthfully right
 5              now, sir.  Sorry about that.
 6                   MR. KVERNE:  I appreciate that and that's
 7              very fair.  And I appreciate that.  That's
 8              actually a very honest answer and I appreciate
 9              that.
10                   So, no further questions.
11                   THE WITNESS:  Thank you, sir.
12                        RECROSS-EXAMINATION
13    BY MR. COOK:
14       Q.   Just one question, Mr. Wilson.  How many
15    millionaires do you know who are in prison?
16              Any?
17       A.   Bernie Madoff.
18       Q.   I think he's dead, isn't he?
19       A.   I don't know.  I mean, personally?  Me
20    personally?  No, I don't know none.
21                   MR. COOK:  Okay.  No other questions.
22                   MR. KVERNE:  Thank you, Madam Court
23              Reporter.
24                   THE COURT REPORTER:  You're welcome.  So
25              are you ordering this transcript?
```

1            MR. KVERNE:  I will be, yes.

2            THE COURT REPORTER:  But not today.

3            MR. KVERNE:  I'm going to order it today.

4    I'm going to order a copy of the transcript

5    today, just an electronic copy, though.  I don't

6    need a hard copy of it.

7            THE COURT REPORTER:  Mr. Cook, would you

8    like a copy?

9            MR. COOK:  Yes, we'll take a copy.

10

11            (Thereupon, the deposition was concluded

12    at 12:08 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                  MIKULICE REPORTING SERVICES
                     2069 First Street, Suite 201
2                     Fort Myers, Florida  33901
                           (239) 334-6545
3                          (READ LETTER)

4

5    OCTOBER 2, 2024

6

     BERNARD D. WILSON
7    c/o JAMES V. COOK, ESQUIRE
     Law Office of James Cook
8    314 West Jefferson Street
     Tallahassee, FL  32301
9
     RE: BERNARD D. WILSON, DC#T-24935, VS. INGRAM, ET AL.
10   CASE NO. 5:23-CV-25TKW/MJF
     DEPOSITION OF BARNARD D. WILSON
11   TAKEN ON SEPTEMBER 24, 2024

12
     Dear BARNARD D. WILSON,
13
     Your deposition taken in the above-styled case has been
14   transcribed.

15   Please come to our office located at 2069 First Street,
     Suite 201, Courtney Building, Fort Myers, Florida, in
16   order to complete the reading and signing of the
     transcript.
17
     Our office hours are from 8:30 a.m. to 5:00 p.m., Monday
18   through Friday.

19   Your prompt attention to this matter is appreciated.  If
     you have not appeared within 10 days from the date of
20   this letter, your deposition will be forwarded on to the
     appropriate attorney
21
     Sincerely,
22

23   Andrea J. Stefanick, RPR, RMR, CRR, CRC, FPR
     Court Reporter
24
     cc:  ERIK KVERNE, ESQUIRE
25        JAMES COOK, ESQUIRE
```

1              ERRATA SHEET

2     RECORD CHANGES HERE - DO NOT WRITE ON TRANSCRIPT

3   BERNARD D. WILSON, DC#T-24935, VS. INGRAM, ET AL.
    CASE NO. 5:23-CV-25TKW/MJF
4   DEPOSITION OF: BARNARD D. WILSON
    DATE TAKEN: SEPTEMBER 24, 2024

5
    PAGE/LINE              CHANGE                    REASON
6
7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  Under the penalties of perjury, I declare that I have
    read my deposition and that it is true and correct
23  subject to any changes in form or substance entered here
    and that the facts stated therein are true.

24

25  _____                _____
    (Date)                  BARNARD D. WILSON

1              CERTIFICATE OF OATH

2

3   STATE OF FLORIDA      )

4   COUNTY OF LEE         )

5

6        I, ANDREA J. STEFANICK, Registered Professional

7   Reporter, Registered Merit Reporter, Certified Realtime

8   Reporter, Certified Realtime Captioner, Certified

9   Florida Professional Reporter for the 20th Judicial

10  Circuit of Florida, and Notary Public, State of Florida

11  at Large, certify that BARNARD D. WILSON appeared before

12  me BY ZOOM VIDEOCONFERENCE and was remotely sworn or

13  affirmed.

14

15       WITNESS my hand and official seal this 2nd day of

16  October, 2024.

17

18  _____

19       ANDREA J. STEFANICK, RPR, RMR, CRR, CRC, FPR-C
         Court Reporter
20       Notary Public - State of Florida
         Commission # HH 280007
21       Expires:  September 27, 2026

22

23

24

25

```
 1                    CERTIFICATE OF REPORTER

 2
     STATE OF FLORIDA      )
 3
     COUNTY OF LEE         )
 4

 5

 6        I, Andrea J. Stefanick, RPR, RMR, CRR, CRC,

 7   FPR-C, Court Reporter for the 20th Judicial Circuit of

 8   the State of Florida, and Notary Public, State of

 9   Florida at Large, do certify that I was authorized to

10   and did, BY ZOOM VIDEOCONFERENCE, stenographically

11   report the foregoing deposition of BARNARD D. WILSON,

12   and that the foregoing typewritten transcript,

13   consisting of pages 1 through 117, is a true record of

14   the testimony given by the witness.

15

16        I further certify that I am not a relative,

17   employee, attorney or counsel of any of the parties, nor

18   am I a relative or employee of any of the parties'

19   attorney or counsel connected with the action, nor am I

20   financially interested in the action.

21

22        Dated this 2nd day of October, 2024.

23

24        _____

25        ANDREA J. STEFANICK, RPR, RMR, CRR, CRC, FPR
          Court Reporter
```