UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

BERNARD D. WILSON,

     Plaintiff,

vs.

INGRAM, et al.,

     Defendants.

Case No. 5:23-cv-00253-TKW-MJF

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Bernard Wilson responds to Defendants' motion for summary judgment. (Doc. 74). Because Defendants deny wrongdoing despite the record, these matters must be resolved by a jury.

### Plaintiff's Opposing Statement of Facts

*Background*

In 2018 Wilson filed a lawsuit against officers at Liberty Correctional Institution ("C.I."). (*Wilson v. Johnson*, 4:18-cv-00310, FLND (*Johnson* Doc. 1)).[1] The case settled in 2020. (Grievance 1/21/22, Doc. 78-1).[2] (*See Johnson* Doc. 94).

_____

[1] https://www.courtlistener.com/docket/17240647/wilson-v-johnson/
[2] All grievances herein are Wilson's.

On January 21, 2022, Mr. Wilson, an inmate at Calhoun C.I.,
submitted a grievance against Sgt. Shuler. (Doc. 78-1). Wilson claimed
Shuler asked, "Wilson where your pussy ass going?" *Id.* Wilson responded
he was going to legal mail. *Id.* Shuler replied, "Your snitch ass going to file
another lawsuit? […] If you file a lawsuit on anybody here then me and my
brothers will guarantee that you won't live to collect." *Id.*

On August 10, 2022, Wilson was transferred from Calhoun to
Jackson C.I.'s Administrative Management Unit (A.M.U.). (Doc. 74-2).

Between arrival at Jackson and the date of the incident that is the
subject of this lawsuit (Nov. 8, 2022), Wilson filed several grievances:

On 8/17/22, Wilson filed an informal grievance to the Jackson C.I.
warden for wrongful placement in A.M.U., based on frivolous allegations, in
which Wilson stated he is "familiar with the rumors of this administration,
and its staff, [the] reputation for retaliating against inmates for their
exercising their rights to the redress of the grievance procedure!" (Doc. 78-
2 at 2).

On 8/18/22 he filed an informal grievance for failure to receive legal
mail. (Doc. 78-3).

2

On 10/11/22, Mr. Wilson was placed in confinement cell H1219. (Doc. 78-15)[3]

On 10/20/22, still in confinement, Wilson filed an informal grievance protesting suspension of canteen privileges, denied on 10/28/22. (Doc. 78-4 at 1-2). On 10/31/22 Wilson appealed the denial. (*Id.* at 3). On 11/2/22 an assistant warden removed the suspension. (*Id.* at 4).

A few days earlier, on 10/31/22, inmate Webens Veillard was placed in cell H1219, with Wilson, until 11/4/22. (Docs. 74-2, 74-3).

*November 4, 2022*

Wilson was still confined on Nov. 4. (Wilson Deposition 31:21-23, Doc. 74-17).[4, 5]

On 11/4/22, Veillard was removed from cell H1219 for a shower and informed staff that Wilson (his cellmate) sexually assaulted him. (Wilson 25:23-26:1, 26:7-10, 26:25).

An investigation was opened under the Prison Rape Elimination Act ("PREA"). (Docs. 74-8, 74-9).

---

[3] H1219 is in H Dormitory, the Jackson C.I. confinement unit.

[4] Citations to deposition pages herein ignore Defendants' exhibit cover pages and refer to the actual page of the transcript.

[5] Depositions will be cited only with deponent's last name and the pincite.

Wilson denied Veillard's allegations (Doc. 74-9 at 16; Wilson 27:12-14), and the Office of the Inspector General later found them unfounded. (Doc. 74-9 at 16).

Wilson and Veillard do agree that the two fought on November 4, before Veillard was removed from the cell. (Doc. 74-9 at 6; Veillard Deposition 21:4-11, 19-25, 24:7-25:7, Doc. 74-10).

They fought a long time. Veillard ended up in a headlock, Wilson ended up on the floor, and Veillard punched Wilson. (Veillard 25:3-7). Veillard claimed he almost lost his life. *Id.*

Wilson was removed from the cell and taken to the medical facility for a PREA assessment. (Wilson 26:2-3).

After the PREA assessment, Wilson returned to cell H1219 where he remained until Nov. 8. (Wilson 13:17-25, 30:3-8).

Veillard was moved to a separate cell. (Wilson 26:4-6, 30:3-5).

*November 8, 2022*

<u>Escort to Shower</u>

On Nov. 8, between 12:30 p.m. and 2:00 pm, Wilson was taken from his cell. (Wilson 30:18-25; Doc. 78-6).

Wilson was told to cuff up. (Wilson 31:4-9). He believed he was being released from confinement but was placed in the shower by Defendant Causey. (*Id.* at 31:4-9, 34:14-17).

While Wilson was escorted to the shower, Causey made a derogatory statement which Wilson cannot remember because officers had made so many derogatory statements by that time. (*Id.* at 34:19-35:4).

Wilson did not know why he was being taken to the shower. (*Id.* at 31:4-5).

<u>Escort from Shower to Wing</u>

Within an hour of being placed in the shower, Defendants Ingram and Granger returned for Wilson. (Wilson 35:9-11, 15-18).

Wilson was cuffed behind his back, and Granger and Ingram escorted him to Wing 2. (*Id.* at 33:1, 34:14-15, 35:20-22, 33:6).

Wilson testified that Granger made a statement referring to Wilson writing grievances: "He literally just made it out of the blue while we were walking. 'Well, you like to write grievances and we'll show you how we deal with snitches.'" (*Id.* at 36:15-18).

Wilson was escorted to room H2201. (*Id.* at 37:6-8).

<u>At Cell Door</u>

Once they got to the cell door (H2201), Wilson observed Veillard inside. (Wilson 33:11-12).

Wilson explained to Granger, Ingram and Causey that he could not go in the cell with Veillard due to a PREA investigation. (*Id.* at 33:13-16). Wilson stated, "I can't go in there with him! I'm afraid he's gonna beat me up and we are 'keep separate.'" (Doc. 78-9).

Wilson panicked. (Wilson 33:16, 37:12-20).

Wilson told them Veillard would kill him if he went in. (*Id.* at 33:16-17).

Wilson testified that Granger, Causey and Ingram all made derogatory statements: "It's my turn to be molested. Take it like a man. Stop being a coward. Things of that nature. This is what happens to snitches. You like to write grievances, well, it's like that." (*Id.* at 33:18-24).

Wilson thought Veillard was asleep. (*Id.* at 37:21-38:1). The officers woke him up. (*Id.* at 38:2-5).

When Veillard saw Wilson and the officers, Veillard stated Wilson was the one he alleged PREA on, who sexually assaulted him, and that if Wilson comes in, what he's going to do. (*Id.* at 38:6-11).

Veillard asked them not to place Wilson in there, but they did. (*Id.* at 38:12-18).

6

Veillard testified he was lying down when Wilson came in, and Veillard yelled, what the hell is going on? (Veillard 51:22-23).

Wilson described Causey's statements: "Something along the lines of my turn to be fucked or my turn to be screwed or molested or something along those lines. It's my turn." (Wilson 40:14-17). Causey said this while Wilson was trying not to be put in the cell. (*Id.* at 41:1-5, 41:14-17).

Veillard testified that on November 8th officers placed Wilson in the cell with him and the fight began again. (Veillard 30:2-22, 31:2-16).

## Forced into the Cell

The officers forced Wilson into the cell after many comments, such as: "Get your bitch, get his ass in there and fuckin' fight." (Wilson 38:21-24).

When Defendants pushed Wilson into the cell, Veillard hit Wilson in the head, causing Wilson to fall and hit his back on the edge of the steel bunk. (Doc. 78-9).

Once Wilson was inside the cell, Veillard attacked Wilson while Wilson was still in handcuffs. *Id.*

## Handcuffing Protocol

When an inmate is moved to a cell where there is already an inmate, before the cell door is opened, the inmate inside must first put his hands through the cell door flap, get handcuffed, then move to the back of the cell,

and remain there until the other inmate is placed inside the cell. (Ingram Deposition 62:10- 63:25, Doc. 74-11). Once the door is shut, each inmate gets uncuffed, through the flap. *Id.* During this process, both inmates are cuffed behind their back, with no exceptions to this protocol. (Ingram 65:16-18, 68:25-69:5).

However, on November 8, Ingram, Granger and Causey completely disregarded this mandatory protocol.

### Veillard Was Not Cuffed

Veillard testified he was supposed to get handcuffed before they opened the door, but he was not. They just pushed Wilson into the room. (Veillard 15:15-20; 32:5-6, 15-18; 51:1-3).

Veillard repeatedly yelled, as he did not know if Wilson had a weapon, and already "had a problem" with Wilson. (*Id.* at 33:6-10). He was scared and had never seen anything like that in his life. (*Id.* at 33:13-15).

### Removing Handcuffs

Though Veillard was not handcuffed (Veillard 15:15:19), Wilson was handcuffed behind his back when he was pushed into the cell (*id.* at 34:8-15).

The officers closed the door and opened the cuffing portal, Wilson placed his hands through the portal (to be uncuffed), and Veillard attacked Wilson as they were removing Wilson's cuffs. (Wilson 41:23-42:14).

<u>Uncuffing and the Fight</u>

Veillard attacked Wilson, kicking and punching Wilson as his cuffs were being removed. (Wilson 43:8-10).

Veillard attacked Wilson on top of the head, and on his shoulders and back. (*Id.* at 43:11-14).

It took 20 or 30 seconds to remove the cuffs. (*Id.* at 43:15-22).

As he was uncuffed, Wilson used the first hand that became free to protect himself. (*Id.* at 44:1-3). (Wilson thinks his left hand was freed first. (*Id.* at 44:5-9).)

Wilson started protecting his face. (*Id.* at 44:11-14).

A couple of seconds later they removed the right handcuff. (*Id.* at 44:15-17). The officers pulled the handcuffs through and shut the portal. (*Id.* at 44:20-22).

At this point both of Wilson's hands were free. (*Id.* at 44:18-19).

Wilson testified: "What's happening now is I fall. I remember falling, kind of blacked out for a second, for a minute. When I came to, he was still yelling and screaming: 'I'm going to kill you, I'm going to kill you. Y'all better

come get him.' Yadda, yadda, yadda. And I finally got up. And when I was trying to get up, he attacked me again and that's when he proceeded to fight. (*Id.* at 44:25-45:10). That's when it turned into a physical altercation between both of us." *Id.*

Wilson described it as "an attack rolled over into a fistfight." (*Id.* at 45:14-19).

The fight lasted approximately 40 minutes. (*Id.* at 45:20-23, 53:3-5).

There were separate rounds like a boxing match, with what Wilson described as "a few pit stops along the way." (*Id.* at 46:3-8).

<u>Presence of Officers</u>

When Wilson was placed inside the cell, Granger and Ingram were standing at the cell. (Wilson 39:21-40:1).

Causey was back and forth throughout the wing, which is not so big. (*Id.* at 40:2-6). He'd pass by (the cell), look in and say things and walk off. *Id.*

Confinement staff approached the cell several times and taunted Wilson, encouraging Veillard to continue assaulting him. (Doc. 78-6).

## Protocol if Inmate Makes PREA Allegations During Move

In a cell move, if one inmate says he has a PREA allegation against him (by the other), the officers should stop the move, place the incoming inmate in a holding cell, and then check on that. (Ingram 69:7-70:3).

Although both Wilson and Veillard told officers there was a PREA allegation between them, (Wilson 33:13-16, 38:6-11), Wilson was pushed into the cell.

## During the Fight

During the fight Granger, Ingram or Causey came to the door, looked in the cell and encouraged Veillard. (Wilson 46:16-20).

Wilson repeatedly said, "get me out of here," but the officers stood at the cell, smirking, laughing and encouraged the fighting. (*Id.* at 46:21-47:1).

All of the officers had radios and are supposed to have radios any time they're on the floor. (*Id.* at 47:8-9).

None of them called backup during that time. (*Id.* at 47:2-4, 10-12).

The officers came "ones and twos at a time," looking through the window, laughing and smirking, then walked away. (*Id.* at 47:23-48:6).

Veillard was yelling "Get him out of here," and Wilson was screaming to be removed. (*Id.* at 49:9-13).

Between the beginning and final conclusion of the fight, when the officers came to the door, there was some negotiation, with both inmates covered in blood asking to be removed. (*Id.* at 49:14-25). They showed the officers blood, saying "Please get me out here. He's going to kill me." *Id.* There was blood everywhere and the officer could not help seeing what was occurring. *Id.* Wilson was bleeding from a bite wound on his stomach.[6] (*Id.* at 49:24-50:3). Blood covered Wilson's pillow and Veillard's boxers. (*Id.* at 50:1-50:3). Veillard was bleeding everywhere. (Veillard 37:12-13).

When the officers left and Veillard saw they would not remove Wilson, he continued to attack. (Wilson 50:7-16).

Officers repeatedly came to the cell and left for a long time. (*Id.* at 51:3-15, 16-19, 52:25-53:2).

Despite the pleas to be removed, the officer would walk away and the fighting would begin again. (*Id.* at 52:25-53:2).

### Presence of Officers During Fight

Asked whether during the fight on November 8th he saw Granger come to the cell at any point, Veillard answered, "They was in front of the door, watching the fight while I was bleeding." (Veillard 52:20-23).

Granger watched the fight. (*Id.* at 53:5-6).

---

[6] Veillard testified he bit Wilson. (Veillard 40:12-15).

When asked if Granger did anything to stop the fight, Veillard replied, "They didn't want to stop the fight. […] They want to watch the fight." (*Id.* at 53:9-13).

Veillard testified that Ingram assisted the fight and wanted him to fight more. (*Id.* at 55:11-13).

### Lt. Oliver

After about 40 minutes, Lieutenant Oliver came to the cell. (Wilson 53:7-8, 22-24).

Wilson and Veillard tried to get Oliver to stop the fight. (*Id.* at 53:8-18). Wilson begged Oliver to remove him, showing him the blood and injuries—to which Oliver stated "You gotta deal with it!" (Doc. 78-9; Wilson 53:8-18). Oliver encouraged Veillard to assault Wilson. (Doc. 78-9).

When Oliver walked away, Veillard renewed his attack. (Wilson 55:3-14).

Oliver returned 10 to 30 minutes later, and informed Wilson he wasn't supposed to be in that cell. (*Id.* at 53:18-20, 55:19-56:6).

Causey moved Wilson back to Wing 1, cell H1208. (*Id.* at 57:2-9, 12-18).

<u>Transfer to Medical</u>

About an hour later, Causey took Wilson to the H dorm medical room and dropped him off. (Wilson 61, 63, 64).

En route, Causey antagonistically stated to Wilson, "You got what you're looking for, huh?" (*Id.* at 62:21-63:5).

<u>Medical</u>

When Wilson arrived, Ingram, Oliver and a nurse were present. (Wilson 64:8-10, 64:25-65:8).

The nurse asked if he had any injuries he wanted to report. (*Id.* at 66:7-11).

Wilson answered yes, she asked him where, and he began to show her his wounds, including the bite. (*Id.* at 66:11-13).

As Wilson began to report his injuries, Sgt. Ingram said: "Wait, wait, hold up. Before you report those injuries, before you document those injuries, I want to let you know what's going to happen. If you say something about them injuries, you're going to be in confinement longer, I'm going to hook you up, write some more DRs, and I'm going to gas your

ass."[7] (*Id.* at 76:14-20). Ingram said, "Shut the fuck up. Don't mention nothing. We're just making it look good for the camera." (*Id.* at 66:25-67:2).

Wilson was scheduled to leave confinement (Dorm H) the next day. (*See id.* at 66:21-24).

Wilson could tell that the nurse was frustrated and wanted him to tell everything. (*Id.* at 67:3-4).

From his experience, Wilson knew to take such threats seriously. (*Id.* at 67:7-9).

So Wilson did not report his injuries to the nurse. (*Id.* at 67:11-13).

Oliver attempted to encourage Wilson to report his injuries, but Ingram stated words to the effect, No, no, this is how it's going to go. (*Id.* at 68:6-18). Ingram basically took over and Oliver remained mute, despite the fact that Oliver was his superior. (*Id.* at 68:6-18). Wilson could tell Ingram was running the show. (*Id.* at 68:6-18).

The nurse said nothing. (*Id.* at 68:19-20).

After medical, Wilson was taken to H1208. (*Id.* at 82:1-5).

---

[7] "Hook you up" means to keep the inmate in confinement indefinitely, by writing false disciplinary reports, and lying about the inmate, which sometimes includes planting knives and contraband on the inmate. (Wilson 105:8-20). "DR" is a disciplinary report.

Release to General Population

Wilson was released from H Dorm to general population the next day, November 9. (*See* Doc. 78-15).

*Post-Nov. 8 Grievances*

Shortly after the Nov. 8 incident, Wilson filed several grievances on the incident. One or more of them led to Defendant Jones retaliating against Wilson on Nov. 13 when she searched his cell, planted evidence, and took him to confinement.

On 11/9/22 Wilson filed an informal grievance related to the events of Nov. 8. (However, he accidentally listed the date as Nov. 4.) (*See* Doc. 78-5; Wilson 12:17-21).

On 11/10/22, Wilson filed a detailed grievance regarding Nov. 8, recounting confinement staff threats against him. (Doc. 78-6).

On 11/10/22, he also submitted a Sick-Call Request, stating he had wounds from the November 8 assault that caused him pain. (Doc. 78-7).

On 11/11/22, Wilson submitted a grievance against Lt. Patrice Barnes who saw Wilson en route to the dining hall, called him a "snitch" and "stupid writ-writer," told him he'd never eat while she was present, sent him back to his dorm without eating, and later entered his dorm, ordered inmates to

lockdown, and told the dorm she would lock them down every morning she was present and torture them, and to blame Wilson. (Doc. 78-8).

*November 13, 2022*

<u>Search & Confinement</u>

On November 13, 2022, between 5 and 6:30 pm, Wilson was housed in G4-108, and Defendant Jones came to the dormitory, proceeded directly to his assigned cell and began to "search." (Doc. 78-9; Wilson 11:6-20, 14:22-24).

Jones was not assigned to G dorm at all. (Doc. 78-9).

Jones allegedly discovered 2 grams of loose tobacco wrapped in cellophane inside Wilson's cell at 5:05 p.m. (Doc. 74-15 at 2, 3, 6-7; Jones Deposition 56:18-57:4, 54:17-57:4, Doc. 74-13).

In his 11/14/22 grievance Wilson put the word "search" in quotation marks, indicating Jones's "search" was bogus. (Doc. 78-9 at 2).

Corrections employees are allowed to bring into work one pack of cigarettes or one can of smokeless tobacco. (Jones 84:16-25).

Jones only searched Wilson's cell. (Doc. 78-9).

After her "search," Jones cuffed Wilson and escorted him to confinement. (Doc. 78-9).

On the way, Jones called Wilson a "snitch" for writing grievances and a "fucking rat," and said she would make his stay at A.M.U. "a living hell." *Id.*

Jones told Wilson he was being placed in confinement for filing grievances and submitting an inmate request to see medical pertaining to what occurred November 8. (Wilson 12:1-9, 13:17-20).

Wilson was then placed in H Dorm confinement, where he spent approximately a week. (*Id.* at 15:2-4; Doc. 78-9).

<u>Jones Relationship to H Dorm</u>

Jones repeatedly worked in H Dorm:

Jones was assigned to H dorm Third Shift on Nov. 4 and 8 (s*ee* Docs. 78-11, 74-19), including Nov. 4 when Veillard made his PREA allegation, and after the incident on Nov. 8.

Third shift is from 3:00 to 11:30 p.m. (Jones 35:20-21).

On Nov. 4 and 8 Jones worked in the H dorm bubble (i.e., officer station), and was the Third Shift housing unit officer there on Nov. 4 and 8. (*Id.* at 28:13-19, 32:2-34:11).

Jones worked with Ingram in H Dorm and in other capacities. (*Id.* at 58:1-3, 13-15, 58:17-21).

**Memorandum of Law**

Summary judgment may be granted only when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court considering a summary judgment motion must "draw all reasonable inferences in favor of the party opposing summary judgment." *Glasscox v. Argo*, 903 F.3d 1207, 1212 (11th Cir. 2018). Even when the parties agree on a set of facts, a court should deny summary judgment if "reasonable minds might differ on the inferences arising from undisputed facts." *Id.* (quotation omitted). If a factfinder could draw more than one inference from a set of facts, and those multiple inferences create a genuine issue of material fact, summary judgment must be denied. *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1315 (11th Cir. 2007). Credibility determinations, weighing of evidence, and drawing of legitimate inferences are reserved for the jury. *Id.*

**I.    Plaintiff States a Claim for First Amendment Retaliation.**

Defendants focus exclusively on the third element for First Amendment retaliation, that to state a claim for unlawful retaliation for exercising his free speech rights the inmate must show: (3) that there is causal relationship between retaliatory action and protected speech. *Smith v. Mosley*, 532 F.3d 1270 (11th Cir. 2008).

### A. A reasonable jury could find a causal connection between Defendants' retaliatory actions and the protected speech.

In January 2022, Wilson wrote a grievance at Calhoun C.I. for threatened retaliation by Sgt. Shuler, based on a successful lawsuit whose documentation was in the public domain. (Doc. 78-1).

Classification officers at Jackson C.I. would have had access to Wilson's grievances, including his allegation against Sgt. Shuler.

Also, Wilson filed grievances between his arrival at Jackson C.I. and November 8, including a general claim that staff at Jackson had a reputation for retaliation. (Doc. 78-2).

During that period, Wilson also filed a grievance while in H dorm regarding suspension of his canteen rights. (Doc. 78-4).

There is no guarantee that a grievance will remain confidential. If an inmate writes a grievance against an officer, the staff member investigating the grievance might question the officer, depending on the allegations. (Ingram 105:6-19). And a sergeant, lieutenant or captain might discuss a grievance with an officer for clarification on the response. (Causey Deposition 45:18-25, Doc. 74-12).

Wilson alleges malfeasance by not just officers (Causey and Granger) but supervisors: Sgt. Ingram and Lt. Oliver and other non-FDC

employees. A reasonable jury could find that Wilson's grievances would not have remained solely within the hands of higher-ups.

More to the point, Defendants' own statements demonstrate they were retaliating against Wilson.

While escorting Wilson to Veillard's cell, Granger stated, 'Well, <u>you like to write grievances</u> and we'll show you how we deal with snitches.'" (Wilson 36:15-18) (emphasis added).

Wilson testified that Granger, Causey and Ingram made statements including "It's my turn to be molested. Take it like a man. Stop being a coward. Things of that nature. This is what happens to snitches. <u>You like to write grievances</u>, well, it's like that." (*Id.* at 33:18-24) (emphasis added).

When Wilson pleaded not to go into the cell, Ingram stated, "Nah, you'll be alright! Snitches get stitches!" (Doc. 78-6).

Likewise, between Nov. 8 and 13, Wilson wrote a grievance pointing the finger at the confinement staff, specifically citing Sgt. Ingram and Lt. Oliver, for their actions on Nov. 8 and said staff threatened him in the medical unit as well. (Grievance 11/10/22, Doc. 78-6).

During that five-day period Wilson also wrote a grievance against Lt. Patrice Barnes leveling serious charges (Doc. 78-8), and requested a sick call for his Nov. 8 injuries (Doc. 78-7).

21

How Jones learned of these grievances is unknown, but on the way to confinement she called Wilson a "snitch" for writing grievances and a "fucking rat," and said she would make his stay at A.M.U. "a living hell." (Doc. 78-9).

She told Wilson he was being placed in confinement for filing grievances and pursuing a sick call pertaining to November 8th. (Wilson 12:1-9, 13:17-20).

Jurors are explicitly permitted to make inferences and consider circumstantial evidence, and are instructed not to be concerned whether evidence is direct or circumstantial. 11th Circuit Court of Appeals pattern jury instruction 3.3, https://pji.ca11.uscourts.gov, accessed 2/2/22.

A reasonable jury could infer Jones knew of Wilson's grievance based on his direct testimony regarding her statements to him and the circumstantial evidence regarding his filing grievances regarding Nov. 8.

**B. A reasonably jury could conclude that Ingram, Granger and Causey had knowledge of the Nov. 4 PREA allegation and animosity between Wilson and Veillard when they placed Wilson in the cell on Nov. 8.**

Veillard testified that throughout his week-long confinement with Wilson he repeatedly asked staff—including officers, a sergeant, a lieutenant and a captain—to move him from the cell. (Veillard 13:4-12).

22

On Nov. 4, Ingram worked second shift. (Ingram 15:14-17). It is a reasonable inference that he heard of the fight.

Also, someone with initials "AB" handwrote in Veillard's Daily Record of Special Housing – Supplement at 8:30 p.m. on Nov. 4 that Veillard "will be placed under Special Review" against Wilson. (Doc. 78-16).

Sgt. Arenthius Blakely was assigned to H dorm Third Shift Nov. 4, between 3:00 pm and 11:30 pm. (Doc. 78-11). His initials are A.B. He was the only person assigned to H dorm that shift with initials "AB." (*See id.*)

Blakely also signed a Cell Inspection report for Veillard on 11/4/22. (Doc. 78-17).

Danielle Jones worked Third Shift Nov. 4 in H Dorm with Sgt. Blakely. (Duty Roster 11/4/22, Doc. 78-11). Blakely could have passed information to her.

Blakely also worked Third Shift on Nov. 8 and 13. (Docs. 74-19, 78-14).

Ingram worked Second Shift (7:00 am – 3:30 pm) Nov. 7 and 8. (Docs. 78-13, 74-19; Ingram 16:13-15).

On Nov. 5, Causey worked Second Shift in H Dorm and Third Shift as a DART/Search officer. (Doc. 78-12).

It is unclear to whom Veillard made his initial PREA allegation on

Nov. 4. But clearly Sgt. Blakely knew Wilson and Veillard were enemies.

Second Shift bumps into Third Shift, and a reasonable jury could

believe knowledge of the disagreement between Veillard and Wilson was

disseminated to other H Dorm staff, even on different shifts.

In other words, a reasonable jury could conclude that on Nov. 8, prior

to Wilson's being placed with Veillard, it was no secret that the two should

not be housed together.

### C. Argument that Defendants do not make official decisions to house inmates together fails to disprove malice.

Defendants' Exhibit B (Wilson Internal Movements as of 06/28/24,

Doc. 74-2) shows Wilson was moved to cell H1219 on 10/11/22 and on

Nov. 8 to H1208.

```
10/11/2022  JACKSON C.I.        H1219L    CONFINEMENT-DISC   CONFINEMENT-DISC
11/08/2022  JACKSON C.I.        H1208L    CONFINEMENT-DISC   CONFINEMENT-DISC
11/09/2022  JACKSON C.I.        G4108L    UNASSIGNED-OPEN    UNASSIGNED-OPEN
```

Cell H2201, scene of the Nov. 8 fight, was never registered for

Wilson. *See id.*

But on Nov. 8 Wilson was taken to H2201, where he was forced

inside with Veillard. (Wilson 37:6-38:22).

Wilson was housed in H1208 only after the fight. (Doc. 78-9).

Defendants' Exhibit C (Veillard Internal Movements as of 08/12/24, Doc. 74-3) shows Veillard moved to H1219 on 10/31/22, then moved to H2201 (where the fight occurred) on Nov. 4. His next listed move is 11/28/22.

```
10/31/2022  JACKSON C.I.          H1219U   CONFINEMENT-DISC  CONFINEMENT-DISC
11/04/2022  JACKSON C.I.          H2201U   CONFINEMENT-DISC  CONFINEMENT-DISC
```

In other words, Veillard was actually residing in H2201 on Nov. 8.

Yet Wilson was never officially assigned to H2201. (*See* Doc. 74-2).

A reasonable jury could conclude that Ingram, Causey and Granger moved Wilson to H2201 (Veillard's cell and scene of the Nov. 8 fight) unofficially, upon their own initiative, for—as they told Wilson—retribution.

**D. Defendants' argument that Jones had a legitimate penological purpose to remove Wilson to confinement on Nov. 13 because of her "search" fails under the Summary Judgment standard as the parties disagree on the facts.**

Jones' purported "search" of Wilson's cell in G Dormitory on Nov. 13 occurred around 5:05 pm. (*See* Incident Report, OIG Chain of Custody form, and MINS Incident Report, Doc. 74-15 at 2, 3, 6-7; Jones 56:18-57:4, 54:17-57:4).

Yet that day she was assigned to and performing escort detail from 3:20 to 5:20 p.m. (Jones 23:15-25).

From 3:20 to 5:00 Third Shift begins feeding, wherein specific dorms are called to the chow hall, and for about two hours (maybe longer some days, maybe less some days depending on how many inmates come out) the escort detail does that constantly until the whole compound is fed. (*Id.* at 24:17-25:3).

During escort detail for G dorm, Jones would stay outside the dorm and not go inside. (*Id.* at 30:23-32:18).

In other words, at the time of her G Dorm search, Jones was assigned to chow hall escort duty and would not have—by her own admission—gone inside to perform her assigned duty.

Moreover, Wilson testified that she went straight to his cell and that his was the only cell she searched. (Doc. 78-9).

Moreover, en route to confinement Jones told Wilson he was a snitch for writing grievances, called him a rat and said she would make his life a "living hell." (Doc. 78-9).

She told Wilson he was being placed in confinement for filing grievances and pursuing a sick call pertaining to November 8th. (Wilson 12:1-9, 13:17-20).

Also, Wilson testified officers sometimes plant contraband on inmates. (*Id.* at 105:8-20).

Yet the contraband allegedly found was two grams of loose tobacco, which an officer can legally bring into the facility. (Jones 84:16-25).

One cigarette contains approximately one gram of tobacco.[8]

Yet staff can bring in an entire pack of cigarettes. (Jones 84:16-25).

A reasonable jury could infer that based on the above, Jones planted the tobacco to retaliate.[9]

## II. A reasonable jury could find that Ingram "procured violence" in violation of the Eighth Amendment.

Defendants assert that Ingram did not procure violence, arguing that Ingram lacked knowledge of the Nov. 4 incident.

As explained above, a reasonable jury could infer that Veillard's PREA allegations were known to Dorm H staff, and that Ingram himself knew of the allegations.

Additional evidence also undermines Defendants' argument:

Causey made statements while Wilson was trying not to be put in the cell with Veillard along the lines of it was Wilson's turn to "fucked," "screwed" or "molested." (Wilson 40:14-17, 41:1-5, 41:14-17).

---

[8] NIH National Cancer Institute, "Cigar Smoking and Cancer," https://www.cancer.gov/about-cancer/causes-prevention/risk/tobacco/cigars-fact-sheet

[9] Defendants do not contest Wilson's First Amendment claim regarding the medical room.

Even if hypothetically Ingram did not know about any Nov. 4 allegations, he would have been likely to overhear these statements.

Moreover, at the cell front Veillard told the officers that Veillard had a PREA allegation against Wilson. (*Id.* at 38:6-11).

And both men expressed fear of being placed in the cell together. Veillard was yelling (Veillard 33:6-10, 33:13-15, 51:22-23), and Wilson told them Veillard was going to kill him if he went inside (Wilson 33:16-17).

Wilson's internal movements sheet shows that he was never officially assigned to Veillard's cell on Nov. 8 (H2201), or at any time. (Doc. 74-2).

Ingram's own statement "Snitches get stitches!" (Doc. 78-6) shows Ingram knew Wilson might get hurt in the cell—and need stitches.

Finally, Ingram pushed Wilson into the cell without following the protocol that mandates—without exception—that the inmate inside the cell (Veillard) be cuffed first. Ingram meticulously outlined the protocol in his deposition; he knew the protocol. (Ingram 62:10-63:25). Placing Wilson, cuffed in back, in the cell with Veillard, who was not cuffed, gave Veillard the opportunity to initiate the attack, which is what occurred.

The fact that Ingram ignored this protocol—a fact corroborated by both Veillard and Wilson—demolishes any notion that his intentions were innocent.

28

Ingram saw the two men fighting and did nothing to stop it.

And as the senior officer at the cell front on Nov. 8, Ingram allowed his subordinates, Causey and Granger, to participate in his procurement of violence.

For the foregoing reasons, a reasonable jury could conclude that Ingram was procuring violence.

### III.    Wilson states a Failure to Protect claim against Causey, and abandons his Failure to Protect claim again Jones.

Plaintiff made claims against all Defendants for failure to protect on November 8. However, in their Motion for Summary Judgment, Defendants only address Causey and Jones regarding this claim. (Doc. 74 at 11-16).

Defendants' silence on this claim waives the argument as to Ingram and Granger.

With respect to Jones, Plaintiff concedes that the discovery process yielded no evidence that Jones participated in placing Wilson and Veillard together on Nov. 8. Plaintiff withdraws the failure to protect claim as to her.

A reasonable jury, however, could find Causey failed to protect Wilson.

Prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). The Eighth Amendment test for "deliberate indifference" is "subjective

recklessness" as used in the criminal law. *Farmer*, 511 U.S. at 839; *Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024).[10]

Defendants' entire argument regarding Causey is that he did not escort Wilson to the cell, and was not involved in placing Wilson in the cell. (Doc. 74 at 16).

But Wilson makes clear throughout his testimony that Causey was at the door before Wilson was placed in the cell with Veillard and came and went to the cell encouraging the fight.

Causey made statements, around the time the door was opened, while Wilson was trying not to be put in the cell with Veillard, along the lines of it was Wilson's turn to "fucked," "screwed" or "molested." (Wilson 40:14-17, 41:1-5, 41:14-17).

Wilson explained to Causey, as well as Granger and Ingram, that he could not go in the cell with Veillard due to a PREA investigation. (*Id.* at 33:13-16).

---

[10] See also Florida Department of Corrections rules: Each employee's conduct "shall at all times maintain proper security and welfare of (…) inmates (…)." Fl. Admin. Code r. 33-208.002 Rules of Conduct. (eff. 6.3.21), § (3)(a). "No employee shall willfully or negligently treat an inmate in a cruel or inhuman manner (…)." *Id.* at § (8). "Every employee has the responsibility to protect and safeguard (…) the person and property of inmates (…)." *Id.* at § (24).

Wilson told them—including Granger—that Veillard was going to kill him if he went in there. (Wilson 33:16-17).

Wilson testified that Granger, Causey and Ingram "collectively" made derogatory statements, such it was his turn to be molested, "Take it like a man," "Stop being a coward," "This is what happens to snitches," and "You like to write grievances, well, it's like that." (*Id.* at 33:18-24).

Wilson described how during the fight, Causey was back and forth throughout the wing, which is not so big, and would pass by the cell, look in, say things and walk off. (*Id.* at 40:2-6, 10-13).

By Causey's own estimation, the cell door's window was approximately two to three feet tall and four to five inches wide. (Causey 46:20-47:22).

During second shift, the lights are on in the cells and when standing outside the cell with the door closed, one can see every part of the cell except the part directly underneath the bunk against the wall. (*Id.* at 49:23-50:8). And what can be seen can be seen clearly. (*Id.* at 50:6-8).

Wilson and Veillard were both covered in blood, and were showing the officers blood. (Wilson 49:14-50:3). Blood was everywhere, all over Wilson's pillow, on Veillard's boxers, and "all over the cell." (*Id.* at 49:14-50:3).

Moreover, after the fight, while escorting Wilson to the medical room, Causey antagonistically said to Wilson, "You got what you're looking for, huh?" and statements of that nature. (*Id.* at 62:21-63:5).

A reasonable jury could thus conclude that Causey knew what would happen when Wilson was at the cell front, that he observed the fight and blood through the window during the fight, and that he acted with at least deliberate indifference when he did nothing to stop the fight and protect Wilson.

## IV.    Plaintiff states a cause of action against Ingram for interference with medical treatment.

Nurse Everett informed Wilson that she was present for a medical assessment and asked if Wilson had any medical injuries he wanted to report. (Wilson 66:7-11).

Wilson answered yes, she asked him where, and he began to show her the bite wound and other wounds. (*Id.* at 66:11-13).

At this point Ingram intervened and threatened Wilson.

Ingram said: "Wait, wait, hold up. Before you report those injuries, before you document those injuries, I want to let you know what's going to happen. If you say something about them injuries, you're going to be in confinement longer, I'm going to hook you up, write some more DRs, and

I'm going to gas your ass."[11] (*Id.* at 76:14-20). Ingram said, "Shut the fuck up. Don't mention nothing. We're just making it look good for the camera." (*Id.* at 66:25-67:2).

Wilson was scheduled to be released from confinement (Dorm H) the next day. (*See id.* at 66:21-24).

Wilson could tell that the nurse was frustrated, and wanted him to tell everything. (*Id.* at 67:3-4).

But based on his experience in prison, Wilson knew Ingram's threats were to be taken seriously. (*See id.* at 67:7-9).

And so he did not report his injuries to the nurse. (*Id.* at 67:11-13).

When Lt. Oliver tried to encourage Wilson to report his injuries, Ingram stated words to the effect, No, no, this is how it's going to go. (*Id.* at 68:6-18). Ingram basically took over. *Id.* Oliver just remained mute although he was a superior officer. *Id.*

As a result, none of Wilson's injuries were reported.

Yet his lower back was injured. (*Id.* at 77:7, 18). He'd hit his head on the concrete. (*Id.* at 77:6-11, 18). He had bruises on his left and right

---

[11] "Hook you up" means to make the inmate stay in confinement forever, that officers are going to write false disciplinary reports (DRs) or lie on the inmate, which sometimes includes planting knives and contraband on an inmate. (Wilson 105:8-20).

shoulders. (*Id.* at 80:15-16). His shoulder "was screwed up." (*Id.* at 77:8). He had a bite wound on his stomach and rib cage, around his abdomen area. (*Id.* at 77:8-10, 78:13-16). He had several abrasions and lacerations. (*Id.* at 77:10-11). He had several "hickeys" on his head. (*Id.* at 80:17-18).

A reasonable jury could believe that Nurse Everett, in that room with Lt. Oliver and Sgt. Ingram, understood Wilson was being threatened to keep quiet, and that as a witness to that act, she would choose to go along with Ingram, just as Lt. Oliver did, and remain silent.

Wilson's testimony is entirely consistent with her diagram of injuries for him in which she wrote, "No injuries stated or physically noted (knuckles and elbows – free of injuries – skin intact.)" (Doc. 74-5 at 14).

Veillard—Wilson's enemy—testified that he bit Wilson. (Veillard 40:12-15). At the very least Nurse Everett could have noted that. But she did not. A reasonable jury could believe she was complicit with Ingram, however reluctantly.

A reasonable jury could also understand that once she falsified the Diagram of Injuries, she was compelled to continue the falsehood when approached by Defendants for a sworn declaration.

A reasonable jury could believe that had Everett and Wilson not been browbeaten into silence, she would have treated his injuries.

Because Ingram intervened, Wilson receive no antibiotics for the bite, no bandages, no cold packs, and no pain suppressants.

A reasonable jury could find that Ingram interfered with Wilson's medical treatment.

## V. Plaintiff's Facts Demonstrate a Civil Conspiracy.

Defendants' characterization of the application of conspiracy elements to the facts of this case are wrong.[12] First, the Defendants argue that Plaintiff fails to demonstrate the alleged conspiracy "resulted in the actual denial of some underlying constitutional right" and failed to demonstrate that the defendants "reached an understanding" to violate the right." *Grider v. City of Auburn*, 618 F.3d 1240, 1260 (11th Cir. 2010). Here, Defendants Ingram, Causey and Granger, in the presence of each other, jovially made clear their intention to violate Plaintiff's Eighth Amendment right against cruel and unusual punishment. They effectively enlisted an inmate to carry out the punishment and assisted him by leaving him

---

12 "A civil conspiracy requires: (a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy. […] Each coconspirator need not act to further a conspiracy; each need only know of the scheme and assist in it in some way to be held responsible for all of the acts of his coconspirators." *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1159-60 (Fla. 3d DCA 2008) (internal quotations and citations omitted) (collecting cases).

unrestrained while pushing Plaintiff, still hand-cuffed, into the cell. However

reluctantly, Veillard acted in concert with their wishes in attacking Plaintiff

as he was pushed into the cell.

Further, they made clear in the presence of a nurse, who was a

contract agent for Centurion of Florida, LLC, not an FDC employee, that

they wished her not to provide any medical care to Plaintiff. The nurse

witnessed the officers intimidating Plaintiff and, reluctantly or not, silently

acceded to the denial of treatment. (Wilson 67:11-68:20).

Defendants argue Plaintiff's conspiracy claim is barred by the

intracorporate conspiracy doctrine. They claim that the doctrine — which

"holds that acts of corporate agents are attributed to the corporation itself,"

*McAndrew v. Lockheed Martin Corp.*,[13] 206 F.3d 1031, 1036 (11th Cir.

2000) — should apply here because it is "not disputed" that all defendants

in this case were agents of FDC at the time of the incidents. But neither

Veillard nor the nurse were part of the same corporate entity as the officers

and both were ultimately involved, however reluctantly, in the officers'

wrongful acts. Defendant Jones made herself part of the conspiracy by

---

[13] *McAndrew* speaks of "a single legal actor" and cites *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 603 (5th Cir.1981); *United States v. Hartley*, 678 F.2d 961, 970 (11th Cir.1982) *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir.1952) (making clear that by corporate "agents" are included shareholders, officers, and employees).

placing Wilson in confinement, telling him the reason he was placed in confinement was for filing grievances and submitting a request to see medical for injuries suffered on November 8th. (Wilson 12:1-9, 13:17-20). Jones said, "I will make your stay here at A.M.U. a living hell you fucking rat!" (Doc. 78-9).

The Defendants are liable for their conspiracy to violate Plaintiff's rights because they (1) furthered a criminal conspiracy outside the scope of their employment; (2) had a "personal stake" as opposed to a corporate goal, in gratifying personal animus; and (3) engaged in a series of acts to violate the Eighth Amendment. *Metcalf v. Eckerd Youth Alternatives*, No. 8:11-cv-566-T-30EAJ, at *10 (M.D. Fla. Aug. 11, 2011) (intracorporate conspiracy doctrine does not apply when agents act outside the scope of their employment, have an independent personal stake in the action, or engage in a series of acts as opposed to a single action).

## VI.    Plaintiff Is Entitled to Compensatory Damages.

To survive summary judgment, a "more than de minimis" physical injury is required to satisfy § 1997e(e). *Logan v. Hall*, 604 Fed. Appx. 838, 840 (11th Cir. 2015). While the phrase "greater than de minimis" has not been clearly defined, an injury need not be significant. *Id.*

There is "no consensus for how to determine when a physical injury is 'greater than de minimis.'" *Thompson v. Smith*, 805 F. App'x 893, 904 (11th Cir. 2020). A prisoner may recover for greater than *de minimis* physical injury even if it falls short of requiring professional medical attention. *Id.* at 904.

"There certainly is no 'bright line' test for whether an injury is *de minimis*. Instead, this issue requires a fact-intensive inquiry." *Jones v. Schwarz*, No. 3:18-CV-155-LC/MJF, 2021 WL 1201675, at *13 (N.D. Fla. Feb. 16, 2021, J. Michael J. Frank), *report and recommendation adopted*, 2021 WL 1196463 (N.D. Fla. Mar. 29, 2021).

An injury certainly would be *de minimis* if it entailed only "a routine discomfort associated with confinement." *Thompson*, 805 F. App'x at 904. But here, Wilson's 40-minute fight instigated by corrections officers hardly left him with "routine" injuries.

As a result of the incident:

- Wilson had abrasions, like scrapes, on his shins, ankles, hands, elbows, head, face, back, and chest. (Declaration of Bernard Wilson, Doc. 78-10).

- His right eyebrow was split, at the corner of his eye, and bled. *Id.*

38

- His lip was busted on the inside where the lip hit his teeth, as teeth dug through interior of the lip, and took two to three weeks to heal. *Id.*

- In biting Wilson, Veillard removed chunks of skin; a layer of skin was removed. *Id.* (Veillard held on for awhile and Wilson had to poke him in the eye to let go.) *Id.* The wound produced much blood, with blood everywhere, and took over a month to heal. *Id.* Wilson's scar from the bite wound is still visible two years later. *Id.*

- After the attack, Wilson had headaches for about a month. *Id.*

- He also suffered dizziness which lasted about 10 days. *Id.* If he sat up too fast he had to hold onto something and wait to clear his head. *Id.*

- He felt nauseated and queasy for about 4-5 days, which he attributes to hitting the back of his skull on concrete. *Id.*

- His vision was blurred about 10 days. *Id.*

- From hitting his head, he had a swollen lump the size of half a ping pong ball, which took a month to disappear. *Id.* The lump was painful and he could not sleep on the back of his head. *Id.*

- From hitting his back on the metal bed, Wilson continues to feel a sharp shooting pain in his left leg when he steps on his left foot. *Id.* It is difficult for him to get up if he sits too long. *Id.*

A jury must be allowed to consider "the totality" of Wilson's injuries to determine whether "they are more than de minimis because they go beyond the routine discomforts of confinement." *See Wright v. Grant*, No. 1:20-CV-96-AW-GRJ, 2021 WL 3934248, at *9 (N.D. Fla. July 7, 2021), *report and recommendation adopted*, 2021 WL 3931979 (N.D. Fla. Sept. 2, 2021) (holding that reasonable jury might find "the totality" of prisoner's injuries from chemical agent more than *de minimis* ).

Courts typically consider minor cuts and bruises to be *de minimis* physical injuries. *See, e.g.*, *Dixon*, 225 F. App'x at 799 ("[M]ere bruising from the application of restraints is only a de minimis injury.") *But see Law v. McDaniel*, 2008 WL 4371771, at *3 (D. Nev. Aug. 20, 2008) (inmate kicked in the stomach and who suffered bruised ribs but was "not seriously injured" had sufficient injuries to survive motion to dismiss stage; whether or not the injury was "serious" enough in the legal sense was a factual issue that should be decided based upon evidence).

Abrasions and bleeding can be more than de minimis. *See Evans v. Alameida*, 2006 WL 618298, at *1 (E.D. Cal. Mar. 10, 2006), *report and*

*recommendation adopted*, 2006 WL 1774875 (E.D. Cal. June 26, 2006) (order on motion for summary judgment noting prior decision that "abrasions and bleeding" were not de minimis).

Back pain which persisted at least a year can be more than de minimis. *See Benoit v. Bordelon*, 596 F. App'x 264, 269 (5th Cir. 2015) (cited by *Wilson v. Johnson*, No. 4:18-CV-310-RH-MJF, 2020 WL 3052530, at *19 (N.D. Fla. Mar. 31, 2020), *report and recommendation adopted*, 2020 WL 3050229 (N.D. Fla. June 8, 2020)).

In *Wilson v. Johnson*, 2020 WL 3052530, at *19, *supra,* the court found that the evidence, "viewed in its entirety," was sufficient for a reasonable jury to find that the alleged injury—"being hit with closed fists, which caused [the prisoner] to fall backwards onto a concrete slab and resulting in continued lower back pain that has lasted for over one year and is being treated with pain relievers and analgesic balm—is not a 'routine discomfort' associated with confinement, and amounts to a greater than *de minimis* physical injury."

Here, if there is any dispute over the nature and extent of Bernard Wilson's injuries—which are extensive, more than mere "routine discomfort," and include a serious bite wound, chronic leg pain and a

41

lasting scar—then it is for a reasonable jury to decide whether they are *de minimis*.

**VII.   Plaintiff Is Entitled to Request Punitive Damages.**

Defendants' argument that punitive damages are barred by 18 U.S.C. § 3626(a)(1)(A) lacks merit for reasons explained in many opinions. *See Smith v. Williams*, 3:23-CV-5661/TKW/ZCB, 2024 WL 4438320, at *5 (N.D. Fla. Sept. 9, 2024), *report and recommendation adopted*, 2024 WL 4434798 (N.D. Fla. Oct. 7, 2024) (citing *Blake v. Ortega*, No. 3:23-cv-8553/LC/HTC, 2024 WL 2000107, at *4 (N.D. Fla. Mar. 18, 2024), *adopted by* 2024 WL 1996014 (May 6, 2024); *Santiago v. Walden*, No. 3:23cv741/MMH/JBT, 2024 WL 2895319, at *9 (M.D. Fla. June 10, 2024); *Walker v. Bailey*, No. 3:23-cv-511/MMH/MCR, 2024 WL 3520868, at *8 (M.D. Fla. July 24, 2024)).

"The current state of the law does not support the conclusion that section 3626 imposes a categorical prohibition on an award of punitive damages." *Blake*, 2024 WL 2000107 at *4.

Plaintiff adopts wholesale Judge Marcia Morales Howard's reasoning in *Santiago*, 2024 WL 2895319 at *8–9 (declining to dismiss punitive damages request):

Defendants argue that Wilson's request for punitive damages must

be dismissed because it is statutorily barred. (Doc. 74 at 25). According to Defendants, 18 U.S.C. § 3626(a)(1)(A) precludes punitive damages in all civil rights cases because such damages constitute "prospective relief." *Id.* at 25-26. In support of this contention, Defendants assert that punitive damages "are never necessary to correct a violation of a federal right." *Id.* at 26. They also contend that even if an award of punitive damages is necessary to correct such a legal violation, that award could not satisfy the PLRA's "stringent limitations" as the relief is neither "narrowly drawn" nor "the least intrusive means necessary to correct the violation of the Federal right." *Id.* at 27. Plaintiff, however, argues that his request for punitive damages is not statutorily barred but necessary to compensate him for Defendants' actions.

Section 3626(a)(1)(A) provides:

> (1) Prospective relief. – (A) Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A). Defendants are correct that punitive damages are considered "prospective relief" under § 3626. *See Johnson v. Breeden*, 280 F.3d 1308, 1325 (11th Cir. 2002) (holding "punitive damages are prospective relief"), *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389, 395 (2015)). But Defendants' argument that punitive damages, as "prospective relief" under § 3626, are precluded in prisoner civil rights actions is wholly misplaced. *See Santiago*, 2024 WL 2895319 at *8. Indeed, Defendants cite *Johnson* as their primary support for this notion; but in *Johnson*, the court did not hold that punitive damages were unavailable under § 3626 for § 1983 cases. Instead, in *Johnson*, the Eleventh Circuit clarified, in the context of a § 1983 civil rights case, that § 3626(a)(1)(A) merely provides the framework for awarding punitive damages. *Johnson*, 280 F.3d at 1325. It explained "a punitive damages award must be no larger than reasonably necessary to deter the kind of violations of the federal right that occurred in the case...[and] that such awards should be imposed against no more defendants than necessary to serve that deterrent function and that they are the least intrusive way of doing so." *Id.*

No Eleventh Circuit case has addressed Defendants' specific argument here. *See Santiago*, 2024 WL 2895319 at *9. The Court cannot

44

disregard the Eleventh Circuit's long-standing recognition that punitive damages are available in prisoner civil rights actions. *Id.* Indeed, the Eleventh Circuit has held that 42 U.S.C. § 1997e(e) permits claims for punitive damages for § 1983 claims without a physical injury requirement. *Hoever v. Marks*, 993 F.3d 1353, 1364 (11th Cir. 2021).[14] And it has held "(p)unitive damages are appropriate in § 1983 cases 'where a defendant's conduct is motivated by evil intent or involves callous or reckless indifference to federally protected rights." *Barnett v. MacArthur*, 715 F. App'x 894, 905 (11th Cir. 2017). Also, the Eleventh Circuit Civil Pattern Jury Instructions on § 1983 damages include an instruction on awarding punitive damages. *See* Eleventh Circuit Pattern Jury Instruction, Civil Cases, Civil Rights – 42 U.S.C. § 1983 Claims – Damages § 5.13.

Also persuasive are other district court decisions explicitly finding that § 3626(a)(1)(A) does not preclude an award of punitive damages in prisoner civil cases. *Santiago,* 2024 WL 2895319 at *9 (citing *e.g.*, *Brown v. Semple*, No. 3:16-cv-376, 2018 WL 4308564, at *14 (D. Conn. Sept. 10, 2018) (collecting cases); *Douglas v. Byunghak Jin*, No. 11-0350, 2014 WL 1117934, at *4-5 (W.D. Penn. Mar. 20, 2014) (reasoning that if Congress

---

[14] In *Hoever*, the Eleventh Circuit declined to address the availability of punitive damages in prison condition cases under 18 U.S.C. § 3626. *Hoever*, 993 F.3d at 1364 n.5.

"intended to abolish punitive damages in all prisoner litigation under the PLRA, it would have done so directly, and in much plainer terms")). Thus, as in *Santiago*, this Court should decline to find that § 3626 precludes a request for punitive damages in this § 1983 action, and should deny Defendants' Motion.

## VIII.  Conclusion

Wilson's claims must be resolved by a jury, and he is entitled to request compensatory and punitive damages.

Respectfully submitted on February 12, 2025,

> */s/ Joshua Tarjan*
> Joshua Tarjan (FBN 107092)
> THE TARJAN LAW FIRM P.A.
> 12372 SW 82 Avenue
> Pinecrest, FL 33156
> (305) 423-8747
> (323) 243-3186 (cell)
> (786) 842-4430 (fax)
> josh@tarjanlawfirm.com
>
> */s/ James V. Cook*
> JAMES V. COOK, ESQ.
> Florida Bar Number 966843
> Law Office of James Cook
> 314 West Jefferson Street
> Tallahassee, FL 32301
> (850) 222-8080; 561-0836 fax
> cookjv@gmail.com
>
> *Attorneys for Plaintiff*

## CERTIFICATION PURSUANT TO L.R. 7.1(F)

Pursuant to Local Rule 7.1(F), I hereby certify that the foregoing

document contains 8,404 words, inclusive of headings, footnotes, and

quotations, but exclusive of the case style, signature block and certificates.

*/s/ Joshua Tarjan*